CRAIG ARBTIN, APPELLANT AND CROSS-APPELLEE, V.
PURITAN MANUFACTURING CO. AND COLUMBIA NATIONAL
INSURANCE COMPANY/COLUMBIA INSURANCE GROUP,
APPELLEES AND CROSS-APPELLANTS.
696 N.W.2d 905

Filed May 17, 2005.   No. A-04-766.

Glenn A. Pettis, Jr., for appellant.

Jerald L. Rauterkus and Jason R. Yungtum, of Erickson & Sederstrom, P.C., for appellees.

INBODY, Chief Judge, and IRWIN and CARLSON, Judges.

INBODY, Chief Judge.

## INTRODUCTION

Craig Arbtin appeals from the order of the Nebraska Workers' Compensation Court review panel affirming in part and in part reversing the award entered by the trial court. Puritan Manufacturing Co. (Puritan) and Columbia National Insurance Company/Columbia Insurance Group (Columbia) have cross-appealed. For the reasons set forth herein, we affirm the order of the review panel in its entirety.

## STATEMENT OF FACTS

On September 3, 2002, Arbtin filed a petition in the Nebraska Workers' Compensation Court alleging that on September 15, 2000, he was employed by Puritan and sustained a personal injury in an accident arising out of and in the course of his employment. Arbtin claimed that at the time of the accident, he was employed by Puritan as a welder and was earning approximately $12.50 per hour. Arbtin also asserted that "[h]is usual workweek included some overtime producing an average weekly wage of approximately $575.00."

The petition contained the following description of the accident:

> [Arbtin] had welded a large piece of metal in a welding jig which was on two sawhorses, as he attempted to move it, the piece and the jig began to fall off the sawhorses. [Arbtin] bent forward and jerked the piece and the jig back onto the sawhorses. As he did this, he felt a pulling sensation in his left shoulder and neck area. He worked the remaining hour on his shift and went home. At home that evening he experienced severe pain in the neck, upper back area, and left shoulder and was unable to sleep due to the

pain. He took some nonprescription pain medication, but this did not completely relieve his pain. He attempted to return to work on Monday, September 18, 2000, but his activities at work increased his pain and the owner of the company took him to Midwest Minor Medical for treatment. Dr. Yvonne Stephenson started conservative care and referred him to Dr. [David] Clough who believed he had suffered a Rhomboid strain and ordered a trial of physical therapy. [Arbtin] attempted to continue working, but was terminated by [Puritan] in December of 2000. [Arbtin] told Dr. Clough about his termination on January 3, 2001 and his continuing pain but Dr. Clough released him finding him to be at maximum medical healing. [Arbtin] sought treatment from [Dr.] Jay Parsow who examined him on January 8, 2001. Dr. Parsow then died suddenly that evening. [Arbtin] then sought treatment from Dr. Kurt Gold who referred him to Dr. [Kirk] Hutton for surgery for a left rotator cuff tear. Surgery was performed on July 18, 2001. Dr. Gold also referred [Arbtin] to Dr. [Leslie] Hellbusch for cervical surgery. The defendant Columbia [National] Insurance Company refused the request for cervical surgery and refused all further treatment after receiving the opinions of Dr. Dean Wampler who performed an independent medical examination. [Arbtin] needs further surgery and has suffered both permanent disability to his whole body and a permanent scheduled member disability due to his injuries.

Arbtin's petition further asserted that his accident resulted in injuries to his neck and left shoulder and in "pain into his left chest area and back from the neck to under the scapula." He claimed that he had been unable to work due to his injuries, meaning he had not worked since his employment was terminated by Puritan. Arbtin admitted that Columbia "has made some payments to [him] for temporary total and permanent partial disability, medical expenses, and prescription medication, but has refused to allow all medical treatment that was required by the nature of [his] injuries." In its answer to Arbtin's petition, Puritan admitted that Arbtin was employed with Puritan on September 15, 2000, and that he suffered a work-related accident, but Puritan "dispute[d] the nature and extent" of Arbtin's

injuries. Puritan further claimed that all benefits due to Arbtin had been paid and denied all other allegations made by Arbtin.

In a pretrial order filed on July 9, 2003, the compensation court noted that the parties had stipulated that Arbtin was employed by Puritan at the time of the accident and that he "suffered a left shoulder injury . . . in an accident arising out of and in the course of his employment." The parties further stipulated that Arbtin was temporarily totally disabled for 57 weeks—from December 31, 2000, to February 2, 2002—and that Arbtin's shoulder injury had resulted in a 10-percent permanent impairment to his left arm. This left the following issues to be decided at trial: the amount of Arbtin's average weekly wage on September 15, 2000, whether Arbtin suffered a herniated cervical disk as a result of the work-related accident, the extent and duration of any temporary disability caused by Arbtin's herniated cervical disk after February 2, 2002, whether Arbtin was entitled to surgery to treat his herniated cervical disk, and whether Arbtin was entitled to payment of medical bills incurred as a result of his herniated cervical disk.

A trial was held on July 16, 2003. The parties entered numerous exhibits prior to any testimony, including Arbtin's medical records and a "wage statement" detailing the hours worked by Arbtin for Puritan in the 26 weekly pay periods prior to his work-related accident on September 15, 2000. Arbtin testified in his own behalf, stating that he was a welder for Puritan and that he was injured while he was performing his duties for Puritan on Friday, September 15. Arbtin said that when the accident occurred, "[i]t wasn't really painful. I just felt pulled. I mean, it's hard to describe; jerked." Arbtin testified that he first sought medical treatment for his injuries at Midwest Minor Medical (Midwest) on September 18. Arbtin testified that Midwest restricted him to light duty and that he received physical therapy beginning on approximately October 1. He first saw Dr. David Clough on October 13, and Arbtin testified Dr. Clough's prognosis was that Arbtin "had a rhomboid or a muscle strain" and that he should be recovered within a month. Arbtin said that Dr. Clough had indicated that Arbtin's injury was "a Workers' Compensation injury within a reasonable degree of medical certainty."

Arbtin next testified that he saw Dr. Yvonne Stephenson on December 30, 2000. Arbtin testified:

> I was removing a battery from my car, and . . . it was a light battery from Walmart, and the pain in my shoulder, the aggravation all came back, and all this in the same areas that happened on September 15th, and . . . I didn't have insurance because Puritan had terminated me, and they canceled my insurance immediately, and I didn't have my insurance, so I was kind of afraid to go to a doctor, but with the pain I was in, I went to a doctor.

When asked if he saw Dr. Clough again, Arbtin testified that he saw Dr. Clough on January 3, 2001, and that he told Dr. Clough about "what had happened when [he] lifted the battery out of [his] car." Arbtin said that he "went [to see Dr. Clough] like [he had] always done when [he] had pain, [he would] point to where the areas were, the neck and upper shoulder, where the neck meets the back . . . all the same areas." Arbtin testified Dr. Clough told Arbtin that nothing was wrong with him and that he should go back to work; but Arbtin was still in severe pain.

Arbtin testified that after being discharged by Dr. Clough, Arbtin was examined by Dr. Jay Parsow—who passed away soon after the examination—and by Dr. Kurt Gold. Arbtin said that Dr. Gold referred Arbtin to other professionals for more physical therapy and for further medical examinations. Arbtin testified that one of the specialists he was referred to recommended Arbtin have "surgery; cervical surgery, fusion" but that he was unable to have the surgery because Columbia denied it. Arbtin said that he did have shoulder surgery on July 18, 2001, which Columbia did not deny. Arbtin further testified that he received a permanent impairment rating after his shoulder surgery.

Arbtin next testified that during the 26 weekly pay periods prior to his work-related accident, there were "two periods of time when [his] wages were below [his] normal weekly wage." Arbtin said that during one of those weeks, "there was a shortage of work that week" and he left early "because there was no work." Arbtin could not recall whether the second period of lower-than-normal wages was the result of a shortage of work or a missed day of work due to illness. Arbtin said that he still had outstanding bills for medical care and medications and that he

had not been reimbursed for travel expenses he incurred as a result of his medical treatments. When asked how he felt at the time of trial, Arbtin said that his neck hurt "in [the] area where the neck meets the shoulder. It always hurts. And it gets worse . . . when it gets aggravated and starts going down between the upper shoulders."

On cross-examination, Arbtin admitted that his medical records from September 28, 2000, indicated that he denied any numbness or tingling in his left arm. He further admitted that his medical records from Midwest do not say anything about a herniated cervical disk. Arbtin also admitted that during the 26 weekly pay periods prior to his work-related accident, there were some weeks when he worked less than 40 hours per week and some weeks when he worked more than 40 hours per week. On redirect examination, Arbtin claimed that on December 30, when he saw Dr. Stephenson after lifting a battery out of his car, he reported the exact same symptoms as he did after his work-related accident.

Arbtin called Darla Sortino to testify on his behalf. Sortino testified that she and Arbtin had had a romantic relationship and that they had moved in together during the latter part of September 2000, after his work-related accident. She said that Arbtin complained of pain "[i]n his neck, his shoulder, his back, it was under his arm, his chest." Sortino also testified that during September, Arbtin was unable to sleep well and could not perform any kind of physical activities around the house, because he was "[b]asically, immobile due to pain." At the conclusion of Sortino's testimony, both parties rested.

On August 20, 2003, the workers' compensation trial court entered its award. The court first approved the parties' stipulations and then found that Arbtin's average weekly wage on September 15, 2000, was $497.60. Specifically, the court found:

[Arbtin] argues that under Canas v. Maryland Cas. Co., 236 Neb. 164, 459 N.W.2d 533 (1990), [weeks with a shortage of work] should be excluded from calculation. However, Canas dealt with the exclusion of weeks when the employee was unable to work because of illness of the employee, absence for funeral, and the like. Canas did not contemplate the exclusion of weeks when there is a shortage of work,

and the shortage of work is one of the reasons why it is necessary to average the employee's hours. Excluding no weeks, the Court has determined that for the first 17 weeks shown on [the wage statement, Arbtin] worked 715.5 hours and was compensated at the rate of $11.50 per hour. For the next 9 weeks, [Arbtin] worked 376.75 hours and was compensated at the rate of $12.50 per hour. Thus, the Court has concluded that [Arbtin] had an average weekly wage of $497.60 for the purpose of calculating his entitlement to temporary disability compensation. However, for the purpose of calculating his entitlement to permanent disability compensation, each week under 40 hours must be elevated to 40 hours. Thus, [Arbtin] is deemed to have worked 728.25 hours for the first 17 weeks and 384.50 hours for the last 9 weeks. Those calculations result in an average weekly wage for the purpose of calculating permanent disability compensation of $506.97.

Regarding the issue of the herniated cervical disk suffered by Arbtin, the trial court found that Arbtin had "failed to adduce persuasive evidence that he suffered a herniated cervical dis[k] as a result of his accident and injury of September 15, 2000." Specifically, the court found:

Dr. Gold has expressed an opinion that [Arbtin's] herniated cervical dis[k] is a result of th[e] accident . . . . Dr. Hellbusch also expresses an opinion that the herniated cervical dis[k] was caused by th[e] accident . . . . Dr. [Gary] Walker of Idaho Falls, Idaho, has expressed an opinion connecting the accident of September 15, 2000, and [Arbtin's] cervical radiculopathy . . . .

Dr. Clough expresses a contrary opinion in his report of June 30, 2003 . . . . Dr. [Dean] Wampler expresses a contrary opinion in his report of January 23, 2002 . . . .

. . . The Court does not find the opinions expressed by [Dr. Gold, Dr. Hellbusch, or Dr. Walker] persuasive because they are based upon a history of neck pain from September 15, 2000, when the medical records do not reflect neck pain until January 8, 2001. The Court finds the opinions of Dr. Wampler and Dr. Clough more persuasive.

As a result of this finding, the trial court found that Arbtin suffered no compensable temporary disability as a result of the herniated disk, that he was not entitled to surgery to treat the herniated disk, and that he was not entitled to the payment of medical bills for the treatment of the herniated disk.

On August 29, 2003, Arbtin applied to the Workers' Compensation Court for a review of the trial court's order by a three-judge panel. On May 12, 2004, the review panel entered its "Order of Affirmance, in Part, and Reversal, in Part, on Review." The review panel determined that the trial court did not err when it found that Arbtin had failed to prove that he had suffered a herniated cervical disk as a result of his work-related accident, finding:

> It is a factual issue as to whether or not [Arbtin's] herniated dis[k] at C6-7 was caused by and/or the result of the accident of September 15, 2000. The trial judge saw and heard the witnesses testify and read the exhibits. We cannot say the trial judge was clearly wrong.

With regard to Arbtin's average weekly wage, the review panel reversed the award of the trial court. The review panel found:

> [Arbtin] claims that week 16, where [he] worked 31.75 hours for the week ending July 2, 2000, and week 23, where [he] worked 32.5 hours for the week ending August 20, 2000, should be excluded in the computation of [his] average weekly wage. [Arbtin] cites [Neb. Rev. Stat. §] 48-126 and Canas v. Maryland Cas. Co., 236 Neb. 164, 459 N.W.2d 533 (1990). . . . In Canas there was evidence that the plaintiff's ordinary work week was 45 to 50 hours per week. In this case, [Arbtin] argues that his ordinary work week can be determined by reviewing [the wage statement] showing the number of hours [he] worked each week. . . . The review of the wage statement shows that [Arbtin] had two weeks of work where he worked less than 37.75 hours. [Arbtin] worked six weeks where he had between 37.75 hours and under 40 hours. [Arbtin] work[ed] eleven weeks where he had between 40 and 45 hours and [he] worked seven weeks where he had more than 45 hours. It is reasonable to find that [Arbtin's] ordinary work week is at least 40 hours per week.

. . . .

We believe that weeks 16 and 23 should be excluded in the computation of [Arbtin's] average weekly wage. When one excludes week 16 the number of hours worked at $11.50 per hour is 683.75 hours. The wages earned during this period of time would be $7,863.12. When week 23 is excluded [Arbtin] worked 344.25 hours at $12.50 per hour. This equals $4,303.12. The total wages for 24 weeks is $12,166.24 which divided by 24 weeks equals $506.93 per week. [Arbtin] is entitled to $337.95 per week for temporary benefits.

Arbtin has timely appealed to this court.

## ASSIGNMENTS OF ERROR

Arbtin's assignments of error, restated, can be consolidated into one: The review panel erred when it affirmed the trial court's finding that Arbtin's herniated cervical disk was not a compensable injury that arose out of his work-related accident. Puritan and Columbia cross-appeal, alleging that the review panel erred when it reversed the trial court's award regarding Arbtin's average weekly wage.

## STANDARD OF REVIEW

■ An appellate court may modify, reverse, or set aside a Workers' Compensation Court decision only when (1) the compensation court acted without or in excess of its powers; (2) the judgment, order, or award was procured by fraud; (3) there is not sufficient competent evidence in the record to warrant the making of the order, judgment, or award; or (4) the findings of fact by the compensation court did not support the order or award. *Williamson v. Werner Enters.*, 12 Neb. App. 642, 682 N.W.2d 723 (2004).

■ Upon appellate review, the findings of fact made by the trial judge of the compensation court have the effect of a jury verdict and will not be disturbed unless clearly wrong. *Id.* An appellate court is obligated in workers' compensation cases to make its own determinations as to questions of law. *Id.*

■ In determining whether to affirm, modify, reverse, or set aside a judgment of the Workers' Compensation Court review

panel, a higher appellate court reviews the findings of the trial judge who conducted the original hearing. *Veatch v. American Tool*, 267 Neb. 711, 676 N.W.2d 730 (2004).

## ANALYSIS
*Compensability of Herniated Cervical Disk Injury.*

Arbtin alleges that the review panel erred when it affirmed the trial court's finding that Arbtin's herniated cervical disk was not a result of his work-related accident. Upon appellate review, the findings of fact made by the trial judge of the compensation court have the effect of a jury verdict and will not be disturbed unless clearly wrong. *Williamson v. Werner Enters., supra.* In determining whether to affirm, modify, reverse, or set aside a judgment of the Workers' Compensation Court review panel, a higher appellate court reviews the findings of the trial judge who conducted the original hearing. *Veatch v. American Tool, supra.*

It is the role of the Nebraska Workers' Compensation Court as the trier of fact to determine which, if any, expert witnesses to believe. *Ludwick v. TriWest Healthcare Alliance*, 267 Neb. 887, 678 N.W.2d 517 (2004). Where the record presents nothing more than conflicting medical testimony, an appellate court will not substitute its judgment for that of the compensation court. *Frank v. A & L Insulation*, 256 Neb. 898, 594 N.W.2d 586 (1999).

The instant case presents a clear example of conflicting medical evidence. Arbtin presented reports from numerous physicians that support his position that his herniated cervical disk was the result of his work-related accident and was thus a compensable injury. However, Puritan produced reports from two physicians that conflicted with the opinions of the medical reports presented by Arbtin. Dr. Clough, one of the first physicians to treat Arbtin after the accident, noted on January 3, 2001, that Arbtin was complaining of pain in an area which "had not been injured during his original injury of September 1[5], 2000, nor noted on the October 13, 2000 exam." Also on January 3, 2001, Dr. Clough found Arbtin to be "at maximal medical improvement . . . . He remains without restrictions and on full work activities . . . . No further medical care will probably be necessary."

Further, Puritan offered a report by Dr. Dean Wampler, who examined and interviewed Arbtin on January 14, 2002. The purpose of Dr. Wampler's evaluation was to assess Arbtin's "physical condition, and explore issues of cause and effect relationships." Dr. Wampler found that many of Arbtin's complaints at the time of this assessment were "inconsistent with the medical records." Dr. Wampler also noted that Arbtin admitted that he had "some 'flare up' of his pain symptoms when struggling to get a battery out of his automobile at the end of December 2000." Ultimately, Dr. Wampler came to the following conclusions:

> [The] medical records show that . . . Arbtin had only a soft tissue injury in September, which resolved by late November of 2000. He then experienced a new injury while lifting a battery out of his vehicle, and resulting in symptoms of shoulder injury with possible cervical radiculopathy. Based on the information currently available to me, I believe with a reasonable degree of medical certainty that . . . Arbtin's shoulder surgery in July of 2001, and continuing symptoms to suggest cervical radiculopathy, are not connected to the work event in September 2000; but rather were caused by events at home on or about December 30, 2000.

(Emphasis omitted.)

In Arbtin's brief, he asserts that the trial court should not have accepted the opinions of Dr. Clough or Dr. Wampler because their "opinions were based upon inaccurate and incomplete facts." Brief for appellant at 21. However, Dr. Clough was one of the first physicians to treat Arbtin after his work-related accident, and Dr. Clough also examined Arbtin shortly after December 28, 2000, the date when Arbtin experienced pain when lifting a battery out of his car. A review of the record shows that Dr. Wampler, when performing his assessment, reviewed all of the relevant medical records produced at trial.

■ The single judge of the Workers' Compensation Court is the sole judge of the credibility of the witnesses and the weight to be given their testimony, even where the issue is not one of live testimonial credibility. *Swanson v. Park Place Automotive*, 267 Neb. 133, 672 N.W.2d 405 (2003). Based on the evidence in the record, we cannot say that the trial court was clearly wrong

in finding the opinions of Drs. Clough and Wampler persuasive and in finding that Arbtin's herniated cervical disk was not a result of his work-related injury. Arbtin's assignment of error is therefore without merit.

*Puritan and Columbia's Cross-Appeal.*

On cross-appeal, Puritan and Columbia assert that the review panel committed error when it improperly reversed the trial court's computation of Arbtin's average weekly wage. The review panel found that "weeks 16 and 23 [weeks in which Arbtin worked less hours than he normally worked] should be excluded in the computation of [Arbtin's] average weekly wage."

■ The determination of how the average weekly wage of a workers' compensation claimant should be calculated is a question of law. *Ramsey v. State*, 259 Neb. 176, 609 N.W.2d 18 (2000). Regarding questions of law, an appellate court in workers' compensation cases is obligated to make its own determinations. *Id.*

Neb. Rev. Stat. § 48-126 (Reissue 2004), which includes how compensable wages should be calculated in workers' compensation cases, provides in relevant part:

> In continuous employments, if immediately prior to the accident the rate of wages was fixed by the day or hour or by the output of the employee, his or her weekly wages shall be taken to be his or her average weekly income for the period of time ordinarily constituting his or her week's work, and using as the basis of calculation his or her earnings during as much of the preceding six months as he or she worked for the same employer, except as provided in sections 48-121 and 48-122. The calculation shall also be made with reference to the average earnings for a working day of ordinary length and exclusive of earnings from overtime.

The only evidence presented at trial by either party regarding what would constitute a normal workweek for Arbtin was a wage statement detailing the hours worked by Arbtin for Puritan in the 26 weekly pay periods prior to his work-related accident. The statement shows that for the nine weekly pay periods preceding his work-related injury, Arbtin earned $12.50 per hour, and that for the other weeks detailed in the wage statement, he earned

$11.50 per hour. For the 26 weekly pay periods preceding Arbtin's work-related injury, the number of hours Arbtin worked were: 37.75 hours in week 1 ending on March 19, 2000, 39.75 hours in week 2, 40 hours in week 3, 50.75 hours in week 4, 42.5 hours in week 5, 39.5 hours in week 6, 40 hours in week 7, 47.75 hours in week 8, 47.25 hours in week 9, 48.75 hours in week 10, 43.25 hours in week 11, 42.5 hours in week 12, 40.5 hours in week 13, 39.25 hours in each of weeks 14 and 15, 31.75 hours in week 16, 45 hours in week 17, 40 hours in week 18, 44.25 hours in week 19, 46.75 hours in week 20, 45.75 hours in week 21, 43 hours in week 22, 32.5 hours in week 23, 39.75 hours in week 24, 40 hours in week 25, and 44.75 hours in week 26 ending on September 10, 2000. As Arbtin testified at trial, and as Puritan and Columbia admitted in their brief, the low number of hours worked by Arbtin during weeks 16 and 23 was the result of a work shortage.

In the parties' briefs, each cites extensively to *Canas v. Maryland Cas. Co.*, 236 Neb. 164, 459 N.W.2d 533 (1990). In *Canas*, the employee's average workweek was 45 to 50 hours, and in the 6 months preceding his work-related injury, "each of [the employee's] workweeks was not less than 44.03 hours or more than 50.87 hours, with seven exceptions. In those 7 weeks, [the employee] worked 20.77, 37.43, 34.75, 14.35, 36.63, 7.78, and 36.75 hours, respectively." *Id.* at 167, 459 N.W.2d at 536. It was uncontroverted that the employee's shortened workweeks were "due to vacation time incurred in moving his family from Texas to Nebraska, sick leave, and holidays." *Id.* at 167, 459 N.W.2d at 536-37. The employer in *Canas* argued that "there would be fluctuations in an employee's workweeks preceding an accident" and that therefore the proper way to calculate an average weekly wage would be to multiply the actual number of hours the injured employee worked in the 26 weeks preceding an accident by the employee's hourly wage and then divide by 26. *Id.* at 167-68, 459 N.W.2d at 537.

The Nebraska Supreme Court disagreed with the employer, stating:

> The fallacy of the [employer's] argument can be demonstrated by deleting the following language from § 48-126: "for the period of time ordinarily constituting his or her

week's work." Without that clause, the sentence at issue would read: "[W]eekly wages shall be taken to be his or her average weekly income . . . and using as the basis of calculation his or her earnings during as much of the preceding six months as he or she worked for the same employer." If the statute so read, one would determine the average weekly wage just as the [employer] suggest[s]. Thus, the [employer's] calculation would be the same even if the foregoing language were deleted. However, effect must be given, if possible, to all the several parts of a statute; no sentence, clause, or word should be rejected as meaningless or superfluous if it can be avoided. *NC+ Hybrids v. Growers Seed Assn.*, 219 Neb. 296, 363 N.W.2d 362 (1985). We conclude that by inclusion of the clause "for the period of time ordinarily constituting his or her week's work," the Legislature sought to exclude those abnormally low workweeks from the 26-week period used for the calculation.

*Canas v. Maryland Cas. Co.*, 236 Neb. 164, 168, 459 N.W.2d 533, 537 (1990).

■ Puritan and Columbia assert in their brief that "the Workers' Compensation Court Review Panel's extension of *Canas* was clearly wrong because *Canas* does not apply to the instant case." Brief for appellees on cross-appeal at 15. Puritan and Columbia first assert that *Canas* applies to "situations involving sickness, illness and holidays, not work shortages." Brief for appellees on cross-appeal at 16. It is true that the facts in *Canas* included an employee who worked a lower-than-normal amount of hours due to moving, sickness, and vacation. However, we see no reason to exclude work shortages from the logic or holding of *Canas*. Nowhere in *Canas* did the Nebraska Supreme Court indicate that the holding was limited to the facts of the case or that workers who missed worktime due to illness, vacation, or other reasons should be treated differently than workers whose employers had a lack of work for them to perform. Accordingly, we find that the rationale and holding in *Canas* regarding average weekly wage calculations extends to work shortages.

Puritan and Columbia next allege that Arbtin's workweeks were not "abnormally low." (Emphasis omitted.) Brief for appellees on cross-appeal at 16. A review of Arbtin's wage statement

indicates that if one does not consider the 2 weeks in which he worked lower-than-normal hours, Arbtin averaged a 42.83-hour workweek in the 26 weekly pay periods preceding his work-related injury. During week 16, he worked 31.75 hours, and during week 23, he worked 32.5 hours. Thus, in each of those weeks, he worked more than 10 hours less than he normally worked during the other 24 weeks included in the wage statement. It is clear to us that these weeks did not present "working day[s] of ordinary length" for Arbtin. See § 48-126. Accordingly, we find that the review panel properly excluded weeks 16 and 23 from its calculation of Arbtin's average weekly wage.

■ Finally, Puritan and Columbia allege that the holding in *Canas* should apply not only to abnormally low workweeks, but also to abnormally high workweeks. In other words, Puritan and Columbia argue that if we find it is proper to exclude the weeks in which Arbtin worked less hours than he normally did from the calculation of his average weekly wage, we should similarly exclude those weeks in which he worked more hours than normal. Puritan and Columbia, citing *Harmon v. Irby Constr. Co.*, 258 Neb. 420, 604 N.W.2d 813 (1999), make the proposition that "workers compensation benefits are intended to be equitable, fair and just to both the employer and employee, while at the same time not creating a windfall for the employee." Brief for appellees on cross-appeal at 19. However, it has long been held that "the Legislature enacted the Nebraska Workers' Compensation Act to relieve injured workers from the adverse economic effects caused by a work-related injury or occupational disease." *Williamson v. Werner Enters.*, 12 Neb. App. 642, 652, 682 N.W.2d 723, 731 (2004). "In light of this beneficent purpose, we must give the act a liberal construction." *Id.*

Further, the Legislature has already addressed the use of abnormally high workweeks in average weekly wage calculations. In § 48-126, the Legislature provided: "The calculation shall also be made with reference to the average earnings for a working day of ordinary length and exclusive of earnings from overtime." Therefore, by excluding a worker's higher rate of pay for overtime from the calculation of the worker's average weekly wage, the Legislature has already dealt with the possible inequity that could result from abnormally high workweeks in the context of

average weekly wage calculations. In light of this, as well as the beneficent purpose of the Workers' Compensation Act, we decline to extend the holding of *Canas v. Maryland Cas. Co.*, 236 Neb. 164, 459 N.W.2d 533 (1990), to abnormally high workweeks. Therefore, we find that the review panel properly reversed the trial court's calculation of Arbtin's average weekly wage. Puritan and Columbia's assignment of error is without merit.

## CONCLUSION

Finding that the review panel properly reversed the trial court's computation of Arbtin's average weekly wage and properly affirmed the trial court's finding that Arbtin failed to prove his herniated cervical disk occurred as a result of his work-related accident, we affirm the order of the review panel in its entirety.

AFFIRMED.