CAROL LUDWICK, APPELLANT, V. TRIWEST HEALTHCARE ALLIANCE AND PHYSICIANS CLINIC, INC., APPELLEES.

678 N.W.2d 517

Filed April 29, 2004.   No. S-02-200.

James E. Harris and Britany S. Shotkoski, of Harris Kuhn Law Firm, L.L.P., for appellant.

Joseph W. Grant, of Hotz, Weaver, Flood, Breitkreutz & Grant, for appellee TriWest Healthcare Alliance.

Kirk S. Blecha and Theresa A. Schneider, of Baird, Holm, McEachen, Pedersen, Hamann & Strasheim, for appellee Physicians Clinic, Inc.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, and MILLER-LERMAN, JJ.

PER CURIAM.

We granted Carol Ludwick's petition for further review of the decision of the Nebraska Court of Appeals in *Ludwick v. TriWest Healthcare Alliance*, No. A-02-200, 2003 WL 282588 (Neb. App. Feb. 11, 2003) (not designated for permanent publication). Ludwick contends the Court of Appeals erred in affirming the trial court's dismissal of her petition based on the appellate court's finding that Ludwick's latex allergy manifested itself in disability in 1992 and that subsequent reactions during her employment with the defendants were merely recurrences.

## FACTUAL BACKGROUND

On March 9, 2001, Ludwick filed an amended petition alleging that she was entitled to workers' compensation benefits because "[o]n or about February 12, 1999, [her] symptomology and latex sensitization deteriorated and worsened to the extent that she could no longer safely perform her work duties and was required to cease her employment and pursue work where the risk of latex exposure would be diminished." Ludwick alleged that she suffered injuries as a result of an occupational disease arising out of and in the course of her employment with Physicians Clinic, Inc. (Physicians), and TriWest Healthcare Alliance (TriWest). Physicians and TriWest denied the allegations, and proceedings were held in the Workers' Compensation Court on June 15, 2001.

Ludwick was employed as a surgical nurse at Bergan Mercy Hospital (Bergan Mercy) from 1981 to 1993. During her time at Bergan Mercy, Ludwick was exposed to latex gloves and latex powder. She experienced rashes, hives, and wheezing symptoms, for which she received medical attention. Ludwick testified that her symptoms seemed to progressively worsen to the point where she was experiencing rashes, hives, and difficulty breathing at least once a month. In 1992, Ludwick had an anaphylactic-reaction to latex that required an epinephrine shot. Ludwick testified that she left Bergan Mercy in 1993 in order to take care of her children and to obtain employment where she would not be exposed to latex gloves because it was her

belief at that time that the powder in the latex gloves was causing her reactions.

From December 1994 to June 1997, Ludwick worked at Physicians as an office nurse. Ludwick was again exposed to latex which caused her to experience latex-related reactions. Ludwick sought medical treatment at Physicians for these reactions and was diagnosed with latex allergies on February 6, 1995. At that time, she was generally advised to avoid latex and began using vinyl gloves. Ludwick testified that she left Physicians to find another position where she would have a decreased exposure to latex.

Ludwick began working at TriWest on June 10, 1997, as a referral nurse, which involved working at a computer and telephone to authorize surgical procedures and did not involve any direct patient contact. Initially, Ludwick did not experience any latex-related problems. However, she began experiencing itching, hives, and difficulty breathing after TriWest moved into a new office building. The move to TriWest's new office building coincided with Ludwick's move into her new home. Ludwick testified that at the time TriWest moved to its new office building, she believed that her reactions may have been the result of problems with her new house. Ludwick testified that she does not know how much latex she was exposed to at TriWest, but that she had reactions "all the time," including four to five emergency room visits. On cross-examination, Ludwick conceded that three of these visits were attributed at the time to allergic reactions to food, not latex.

Ludwick resigned her position at TriWest on February 10, 1999. Initially, Ludwick testified that as a result of her health problems, she was on probation, and that she resigned because she thought she would be fired. On cross-examination, however, Ludwick acknowledged that three of the four documented reasons for her probation were not related to her health problems. The fourth reason was failure to give proper notice when taking time off.

From approximately 1993 continuing to the date of trial, Ludwick worked on an intermittent basis for Nurse Providers. After resigning from TriWest, Ludwick began working full time for Nurse Providers. This work involved providing patient care.

Although Ludwick attempted to limit her exposure to latex in this position, she was unable to avoid it entirely. At the time of trial, Ludwick was still employed by Nurse Providers on an "on-call basis."

At the time of trial in June 2001, Ludwick was also employed by Pediatric Associates as an office nurse, a position she had held since April of that year. Ludwick testified that Pediatric Associates has been able to accommodate her allergy problems, that she has only minor symptoms, and that although she is still exposed to latex and still has reactions, she is doing "better."

Dr. Ted Segura treated Ludwick for her allergies beginning in 1998. In a letter dated June 12, 2001, which was received in evidence at trial, he made recommendations for creating a latex-safe work environment for Ludwick. These recommendations included: avoiding the personal use of latex gloves, avoiding any environment in which powdered latex gloves are used, and avoiding intimate contact with latex items such as dental dams, condoms, balloons, and tourniquets. Despite these restrictions, Segura concluded that "[f]rom the standpoint of her latex allergy alone, Ms. Ludwick should be able to find a full-time position in a latex-safe environment."

Dr. Mary Wampler reviewed Ludwick's medical records. In a letter dated March 6, 2001, which was received at trial, Wampler concluded that Ludwick had developed "Type I" hypersensitivity to latex, or anaphylactic response, during her employment at Bergan Mercy. She stated that once an individual has progressed to this reaction to latex, no more aggravated reaction can occur because it is "as severe a reaction to latex [as] one can develop, short of death." Wampler thus opined that any symptoms Ludwick experienced after leaving Bergan Mercy were simply recurrences of the latex hypersensitivity and did not represent a worsening of her condition.

Jack Greene, a vocational rehabilitation counselor, stated in a report received at trial that Ludwick is able to continue employment as a registered nurse as long as she limits her exposure to latex. Greene opined, however, that Ludwick has experienced a 25-percent loss of earning capacity as a direct result of her hypersensitivity to latex, primarily because of her inability to work in a hospital environment.

The trial court, in its order filed August 22, 2001, dismissed Ludwick's petition, finding that she did not sustain an occupational disease during her employment with either Physicians or TriWest. Relying on Wampler's report, the trial court found that Ludwick's "last injurious exposure" to latex was prior to her employment at either Physicians or TriWest. Ludwick appealed to the workers' compensation review panel, and on January 18, 2002, the review panel affirmed the trial court's dismissal. In addition, the review panel ruled in favor of TriWest on its cross-appeal in which it contended that Ludwick failed to prove exposure to latex in the course of her employment with TriWest.

Ludwick appealed, and in an unpublished opinion, the Court of Appeals affirmed the dismissal without reference to TriWest's cross-appeal. *Ludwick v. TriWest Healthcare Alliance*, No. A-02-200, 2003 WL 282588 (Neb. App. Feb. 11, 2003) (not designated for permanent publication). The Court of Appeals determined that Ludwick's disability occurred in 1992 during her employment at Bergan Mercy, when she was forced to cease work and seek immediate medical attention, and that any subsequent reactions that occurred while she was in the employ of Physicians and TriWest were not causally connected to her disability. We granted Ludwick's petition for further review.

## ASSIGNMENTS OF ERROR

Ludwick assigns, restated, that the Court of Appeals erred in (1) finding that Ludwick's disability, as opposed to her disease, occurred in 1992; (2) finding that Ludwick's acute allergic reactions caused by exposure to latex antigens in the workplace were a recurrence, as opposed to an aggravation, of her latex allergy disease; and (3) failing to apply the last injurious exposure rule.

In a purported cross-appeal asserted in its supplemental brief filed pursuant to Neb. Ct. R. of Prac. 2H (rev. 2002), TriWest assigns that the Court of Appeals erred when it failed to acknowledge and affirm the review panel's action sustaining TriWest's cross-appeal in which the review panel found that Ludwick failed to prove any exposure to latex during the course of her employment with TriWest. We do not reach this issue on appeal because TriWest did not petition for further review. See rule 2.

## STANDARD OF REVIEW

■ An appellate court may modify, reverse, or set aside a Workers' Compensation Court decision only when (1) the compensation court acted without or in excess of its powers; (2) the judgment, order, or award was procured by fraud; (3) there is not sufficient competent evidence in the record to warrant the making of the order, judgment, or award; or (4) the findings of fact by the compensation court did not support the order or award. *Morris v. Nebraska Health System*, 266 Neb. 285, 664 N.W.2d 436 (2003); *Zavala v. ConAgra Beef Co.*, 265 Neb. 188, 655 N.W.2d 692 (2003); *Vega v. Iowa Beef Processors*, 264 Neb. 282, 646 N.W.2d 643 (2002).

■ In determining whether to affirm, modify, reverse, or set aside a judgment of the Workers' Compensation Court review panel, a higher appellate court reviews the findings of the trial judge who conducted the original hearing. *Morris v. Nebraska Health System, supra*; *Frauendorfer v. Lindsay Mfg. Co.*, 263 Neb. 237, 639 N.W.2d 125 (2002).

■ Upon appellate review, the findings of fact made by the trial judge of the compensation court have the effect of a jury verdict and will not be disturbed unless clearly wrong. *Morris v. Nebraska Health System, supra*; *Zavala v. ConAgra Beef Co., supra*; *Frauendorfer v. Lindsay Mfg. Co., supra*. An appellate court is obligated in workers' compensation cases to make its own determinations as to questions of law. *Dawes v. Wittrock Sandblasting & Painting*, 266 Neb. 526, 667 N.W.2d 167 (2003); *Morris v. Nebraska Health System, supra*; *Larsen v. D B Feedyards*, 264 Neb. 483, 648 N.W.2d 306 (2002); *Vega v. Iowa Beef Processors, supra*.

## ANALYSIS

### BACKGROUND

Under the Nebraska Workers' Compensation Act, "[w]hen personal injury is caused to an employee by accident or occupational disease, arising out of and in the course of his or her employment," the employee is entitled to compensation unless willfully negligent at the time of receiving the injury. Neb. Rev. Stat. § 48-101 (Reissue 1998). The central issue in this case is whether Ludwick sustained a compensable injury caused by an

occupational disease arising out of and in the course of her employment with Physicians or TriWest.

■ Under the Nebraska Workers' Compensation Act, an "occupational disease" is a disease which is due to causes and conditions which are characteristic of and peculiar to a particular trade, occupation, process, or employment and excludes all ordinary diseases of life to which the general public is exposed. See Neb. Rev. Stat. § 48-151(3) (Cum. Supp. 2002). "Injury" and "personal injuries" mean only violence to the physical structure of the body and such disease or infection as naturally results therefrom. § 48-151(4). The terms "injury" and "personal injuries" "include disablement resulting from occupational disease." *Id.*

If an injury results in disability, the disabled employee is compensated under the schedule set forth in the act. See Neb. Rev. Stat. §§ 48-109 (Reissue 1998) and 48-121 (Cum. Supp. 2002). If the employee is totally disabled, he or she is compensated based on a fixed percentage of the wages received at the time of the injury. See § 48-121(1). If the employee is partially disabled, except for scheduled member injuries, he or she is compensated for his or her loss of earning power. See § 48-121(2) and (3).

■ Thus, under the Nebraska Workers' Compensation Act, an injury has occurred as the result of an occupational disease when violence has been done to the physical structure of the body and a disability has resulted. See § 48-151(4). In other words, an occupational disease has caused an "injury," within the meaning of the act, at the point it has resulted in disability. See *id.* The resulting disability—assuming that a timely claim has been made—is compensated pursuant to the schedule set forth in the act. See §§ 48-109 and 48-121.

DATE OF DISABILITY

The above illustrates that it is crucial in occupational disease cases to determine the date of disability, because until that date, the employee has suffered no compensable injury. The term "disability," however, is not expressly defined in the act. In cases involving injuries resulting from accidents, we have generally stated that disability is defined in terms of employability and earning capacity rather than in terms of loss of bodily function. See *Minshall v. Plains Mfg. Co.*, 215 Neb. 881, 341 N.W.2d 906

(1983). In occupational disease cases, however, we have referenced the concept of disability slightly differently, stating that disability results at the point when "the injured worker is no longer able to render further service." *Morris v. Nebraska Health System,* 266 Neb. 285, 291, 664 N.W.2d 436, 441 (2003). See, also, *Hull v. Aetna Ins. Co.,* 247 Neb. 713, 529 N.W.2d 783 (1995); *Osteen v. A.C. and S., Inc.,* 209 Neb. 282, 307 N.W.2d 514 (1981); *Hauff v. Kimball,* 163 Neb. 55, 77 N.W.2d 683 (1956). We take this opportunity to clarify that the concept of disability is the same in both accident and occupational disease cases. To do so, it is necessary to examine the historical development of our occupational disease law.

We held in *Hauff v. Kimball, supra,* that the date of injury in cases of occupational disease was the time that disability first occurred.

"Where an occupational disease results from the continual absorption of small quantities of some deleterious substance from the environment of the employment over a considerable period of time, an afflicted employee can be held to be 'injured' only when the accumulated effects of the substance manifest themselves, which is when the employee becomes disabled and entitled to compensation; and the 'date of injury,' within the meaning of the Workmen's Compensation Act, is the date when the disability is first incurred . . . ."

*Hauff v. Kimball,* 163 Neb. at 61, 77 N.W.2d at 687. We reaffirmed that holding in *Osteen v. A.C. and S., Inc., supra.* We also held in *Osteen* that the amount of the plaintiff's award was limited to the statutory maximum in effect at the time the plaintiff stopped working, because "in the case of an occupational disease such as this one, the ' "date of injury," within the meaning of the Workmen's Compensation Act, is the date when the disability is first incurred . . . .' " 209 Neb. at 292, 307 N.W.2d at 521, quoting *Hauff v. Kimball, supra.*

We next addressed the date of injury for occupational diseases in *Hull v. Aetna Ins. Co., supra.* In *Hull,* a dentist became unable to work in his profession due to contact dermatitis, and in order to determine which of two successive workers' compensation insurers was liable for the dentist's disability, we were required to determine the date of injury. *Hull* utilized the "rendering further

service" language for the first time, stating that "the date that determines liability is the date that the employee becomes disabled from rendering further service." 247 Neb. at 719, 529 N.W.2d at 789, citing *Lowery v. McCormick Asbestos Co.*, 300 Md. 28, 475 A.2d 1168 (1984). An examination of *Lowery* provides some context for this formulation of the rule:

> "Occupational disease cases typically show a long history of exposure without actual disability, culminating in the enforced cessation of work on a definite date. In the search for an identifiable instant in time which can perform such necessary functions as to start claim periods running, establish claimant's right to benefits, determine which year's statute applies, and fix the employer and insurer liable for compensation, the date of disability has been found the most satisfactory. Legally, it is the moment at which the right to benefits accrues; as to limitations, it is the moment at which in most instances the claimant ought to know he has a compensable claim; and, as to successive insurers, it has the one cardinal merit of being definite, while such other possible dates as that of the actual contraction of the disease are usually not susceptible to positive demonstration."

300 Md. at 39-40, 475 A.2d at 1174. See 9 Arthur Larson & Lex K. Larson, Larson's Workers' Compensation Law § 153.02[6][a] (2003). Notably, in *Hull v. Aetna Ins. Co.*, 247 Neb. 713, 529 N.W.2d 783 (1995), the employee dentist experienced problems with contact dermatitis from 1987 to 1991. His reaction at one point in 1988 was so significant that it affected his fingers and hands and caused him to miss almost 1 week of work. On March 13, 1989, he was treated by a physician who recommended that he cease practicing dentistry. Although he reduced his hours to 10 per week, he did not completely abandon his dental practice until 1991. On these facts and applying the above rule, we found that the occupational disease manifested itself to the level of disability on March 13, 1989, and thus that that was the date of injury.

Subsequently, the Court of Appeals discussed *Hull* in *Ross v. Baldwin Filters*, 5 Neb. App. 194, 557 N.W.2d 368 (1996). In *Ross*, the plaintiff suffered from a skin condition that doctors linked to her employment as early as 1989. It was not until 1994, however, that the condition began to interfere with her ability to

work and a doctor recommended that she quit her job. Referencing *Hull*, the Court of Appeals found:

> This analysis is consistent with the definition and general treatment of the concept of "disability" under Nebraska workers' compensation laws. For example, "disability" within the meaning of Neb. Rev. Stat. § 48-128 (Reissue 1993), which addresses preexisting disabilities for the purpose of the Second Injury Fund, is defined as "an employee's diminution of employability or impairment of earning power or capacity." *Sherard v. Bethphage Mission, Inc.*, 236 Neb. 900, 909, 464 N.W.2d 343, 349 (1991). For the purpose of Neb. Rev. Stat. § 48-121(1) and (2) (Reissue 1993) (schedule of compensation), "disability" is defined "in terms of employability and earning capacity." *Minshall v. Plains Mfg. Co.*, 215 Neb. 881, 885, 341 N.W.2d 906, 909 (1983). [The plaintiff's] employability at Baldwin Filters first diminished in April 1994, when her condition had progressed to the point where her employment there had to cease.
>
> Thus, we conclude that the statute of limitations did not begin to run until April 1994 . . . .

*Ross v. Baldwin Filters*, 5 Neb. App. at 203, 557 N.W.2d at 373.

In *Jordan v. Morrill County*, 258 Neb. 380, 389, 603 N.W.2d 411, 418 (1999), and *Vonderschmidt v. Sur-Gro*, 262 Neb. 551, 558, 635 N.W.2d 405, 410 (2001), we described occupational disease cases as requiring "cessation of employment," as do repetitive trauma accident cases. Based on this language, the Court of Appeals concluded that the date of injury in both occupational disease and accidental injury cases was the same. See *Watson v. Omaha Pub. Power Dist.*, 9 Neb. App. 909, 622 N.W.2d 163 (2001). However, we recently clarified this aspect of our occupational disease law in *Morris v. Nebraska Health System*, 266 Neb. 285, 293, 664 N.W.2d 436, 442 (2003):

> *Jordan* and *Vonderschmidt* are inapplicable, as they are both repetitive trauma cases. This court has consistently analyzed repetitive trauma injuries as accidents within the meaning of Neb. Rev. Stat. § 48-151(2) (Reissue 1998), rather than occupational diseases. . . . Accordingly, our discussion in *Vonderschmidt* of the "discontinuation of

employment" standard was framed in the context of establishing an identifiable point in time when an accident occurs "suddenly and violently" within the meaning of § 48-151(2). However, such an inquiry is unnecessary in an occupational disease case and, as such, has no application to the issues presented by this case. Any suggestion in either *Jordan* or *Vonderschmidt* that the "discontinuation of employment" standard is the same for both repetitive trauma and occupational disease cases is dicta and contrary to this state's line of occupational disease case law.

We further held in *Morris*:

> When considered collectively, *Hauff* [*v. Kimball*, 163 Neb. 55, 77 N.W.2d 683 (1956)], *Osteen* [*v. A.C. and S., Inc.*, 209 Neb. 282, 307 N.W.2d 514 (1981)], and *Hull* [*v. Aetna Ins Co.*, 247 Neb. 713, 529 N.W.2d 783 (1995)] set forth the rule that in an occupational disease context, *the "date of injury" is that date upon which the accumulated effects of the disease manifest themselves to the point the injured worker is no longer able to render further service. It is on that date that the occupational disease is said to manifest itself to the level of disability* permitting recovery for an occupational disease pursuant to the Nebraska Workers' Compensation Act.

(Emphasis supplied.) 266 Neb. at 291, 664 N.W.2d at 441.

Thus, as recently as *Morris*, we continued to use the "no longer able to render further service" language when referring to "disability" in the occupational disease context. Read literally, this language implies that an employee must be permanently and totally disabled in order to be compensated for an occupational disease. However, as the above discussion of our occupational disease case law reveals, the phraseology means no such thing. Rather, there is no requirement in either our case law or the act that an employee be *totally* disabled in order for the date of injury to be established in an occupational disease case. An employee is "injured," for purposes of the act, on the date when the right to compensation accrues, even if the disability is only partial in nature. We therefore now clarify that the "no longer able to render further service" phraseology in our occupational disease case law refers to nothing other than the date of disability, partial or

total, as that term is commonly understood in workers' compensation law. We hold, restated, that a worker becomes disabled, and thus injured, from an occupational disease at the point in time when a permanent medical impairment or medically assessed work restrictions result in labor market access loss. See, *Green v. Drivers Mgmt., Inc.*, 263 Neb. 197, 639 N.W.2d 94 (2002); *Jorn v. Pigs Unlimited, Inc.*, 255 Neb. 876, 587 N.W.2d 558 (1998). An employee's disability caused by an occupational disease is determined by the employee's diminution of employability or impairment of earning power or earning capacity. See, *Zavala v. ConAgra Beef Co.*, 265 Neb. 188, 655 N.W.2d 692 (2003); *Frauendorfer v. Lindsay Mfg. Co.*, 263 Neb. 237, 639 N.W.2d 125 (2002).

### APPLICATION

In the instant case, the Court of Appeals cited *Jordan v. Morrill County*, 258 Neb. 380, 603 N.W.2d 411 (1999), and *Vonderschmidt v. Sur-Gro*, 262 Neb. 551, 635 N.W.2d 405 (2001), for the proposition that cessation of employment is a requirement for recovery of workers' compensation benefits regardless of whether an injury arises from an accident or an occupational disease. *Ludwick v. TriWest Healthcare Alliance*, No. A-02-200, 2003 WL 282588 (Neb. App. Feb. 11, 2003) (not designated for permanent publication). The court reasoned that because Ludwick was required to cease work temporarily and seek medical attention for an anaphylactic reaction to latex during her employment with Bergan Mercy in 1992, her injury, and thus her disability, occurred on that date and not during her subsequent employment at Physicians or TriWest, when the symptoms recurred. In light of *Morris v. Nebraska Health System*, 266 Neb. 285, 664 N.W.2d 436 (2003), this was an incorrect application of *Jordan* and *Vonderschmidt* to Ludwick's claim that she sustained a disability caused by an occupational disease. However, we agree with the ultimate determination of the Court of Appeals that Ludwick's injury and disability occurred in 1992.

Although no formal work restrictions were imposed upon Ludwick until Segura's recommendations in 2001, Wampler's letter clearly reveals that Ludwick suffered permanent medical impairment as early as 1992, while she was employed at Bergan

Mercy. This medical opinion, combined with the opinion of the vocational rehabilitation expert that Ludwick sustained a 25-percent loss of earning capacity primarily because of her inability to work in a hospital setting because of her hypersensitivity to latex, establishes the onset of her disability in 1992. The remaining question, therefore, is whether her exposures at Physicians and TriWest were merely recurrences or were aggravations of her injury. See *Mendoza v. Omaha Meat Processors*, 225 Neb. 771, 408 N.W.2d 280 (1987).

In this case, the single judge found Wampler's opinion to be credible. Wampler opined that Ludwick's latex hypersensitivity developed during her employment at Bergan Mercy in 1992 and that any reaction after that was recurrent. Wampler specifically concluded that Ludwick's condition could not and did not worsen after her employment at Bergan Mercy. Based on this evidence, the single judge concluded that Ludwick was not entitled to compensation from Physicians or TriWest.

It is the role of the Nebraska Workers' Compensation Court as the trier of fact to determine which, if any, expert witnesses to believe. *Owen v. American Hydraulics*, 258 Neb. 881, 606 N.W.2d 470 (2000). Findings of fact may be reversed by this court only if they are clearly erroneous. *Id.* Based upon Wampler's testimony that Ludwick's latex hypersensitivity occupational disease was not causally related to any latex exposure at either Physicians or TriWest, it was not clearly erroneous for the single judge to find that Physicians and TriWest, the defendants in this case, are not liable for workers' compensation benefits.

## CONCLUSION

Ludwick's claim for compensation has been brought against employers who are not liable for her compensation benefits. The judgment of the Court of Appeals affirming the judgment of the Workers' Compensation Court is therefore affirmed.

AFFIRMED.

McCORMACK, J., not participating.