LOUIS SCOTT, APPELLANT AND CROSS-APPELLEE, V.
DRIVERS MANAGEMENT, INC., A NEBRASKA CORPORATION,
APPELLEE AND CROSS-APPELLANT.
714 N.W.2d 23

Filed April 4, 2006.   No. A-05-011.

James E. Harris and Britany S. Shotkoski, of Harris Kuhn Law Firm, L.L.P., for appellant.

Raymond P. Atwood, Jr., and Ricardo Enriquez, of Atwood, Holsten & Brown Law Firm, P.C., L.L.O., for appellee.

INBODY, Chief Judge, and IRWIN and MOORE, Judges.

INBODY, Chief Judge.

## INTRODUCTION

Louis Scott appeals from the order of the review panel of the Nebraska Workers' Compensation Court affirming in part and in part reversing and remanding the award of the trial court. Drivers Management, Inc. (DMI), cross-appeals. For the reasons set forth herein, we affirm in part, and in part reverse the judgment of the review panel and remand with directions consistent with this opinion.

## STATEMENT OF FACTS

On November 7, 2001, Scott filed a petition in the Workers' Compensation Court alleging that he had "sustained severe personal injuries in an accident arising out of and in the course of his employment with [DMI]" and that "said accident occurred at East State Road and Madison in Princeton, Indiana, and for which injury [Scott] is entitled to workers' compensation benefits." Scott alleged that at the time of his injury, he was working as an over-the-road truckdriver for DMI, and that he was earning an average weekly wage of $605.66. Scott described the accident as follows: "On August 18, 1997, [Scott] was crossing the street at East State Road and Madison in Princeton, Indiana. [Scott] was walking from a restaurant back to his truck when he was violently and unexpectedly struck by a car." Scott alleged that as a result of the accident, he suffered "serious, painful, and permanent injuries," such as a dislocated shoulder, a torn rotator cuff, a "tibia/fibia fracture," and a "concussion which subsequently revealed overwhelming evidence of organic deterioration caused by his closed head injury." Scott further alleged that

he was totally disabled in the accident and that he was "entitled to benefits, past, present and future for temporary total disability, permanent disability and loss of earning capacity."

On November 16, 2001, DMI filed its answer to Scott's petition. DMI admitted that Scott was in its employ on the day of the accident, but DMI generally and specifically denied every other allegation in Scott's petition, except those constituting admissions against Scott's interests. DMI further alleged that "if [Scott] suffers from any injury, impairment or disability or need for medical care, which [DMI] specifically denies, that same resulted solely from sickness, infection, disease or other inherent condition within [Scott]," or that such an injury, impairment, disability, or need for medical care "resulted from the natural progression of a pre-existing condition, and/or is the result of an independent intervening cause, and is not attributable to any accident or occupational diseases arising out of and in the course of [Scott's] employment."

On May 9, 2003, Scott filed a "Motion to Strike the Opinions of [Scott's] Treating Psychologist, Richard Dowell, Jr., Which Were Obtained *Ex Parte*." In Scott's motion, he contended the following:

1. The work-related accident which is the subject of this litigation occurred on August 18, 1997. During the course of . . . Scott's recovery, he was referred to Richard E. Dowell, Jr., Ph.D., for evaluation and treatment due to difficulties he was experiencing with his memory. This referral to Dr. Dowell was made at the request of [Scott's] then treating physician, Dr. [Louis] Conway. Dr. Dowell provided treatment to [Scott] on April 1st and 6th, 1998.

2. After the filing of the Petition in this case, [DMI's] counsel contacted Dr. Dowell *ex parte* on several occasions to discuss the treatment provided to [Scott] by Dr. Dowell. Additionally, defense counsel provided Dr. Dowell with additional documentation prepared by [DMI's] retained expert and asked Dr. Dowell to formulate opinions based upon this information.

3. Dr. Dowell prepared his initial report dated February 21, 2003, wherein he expressed several opinions regarding [Scott] based upon the information which was provided to

him *ex parte* by defense counsel. Dr. Dowell's deposition was taken by [Scott] on April 16, 2003. Thereafter Dr. Dowell provided a second report dated May 5, 2003 expressing additional opinions in this case.

4. At no time did [Scott] waive the physician/patient privilege, or provide Dr. Dowell with a release authorizing him to discuss his treatment with [DMI] or its counsel.

. . . .

9. [Scott] has refused to waive his privilege with respect to *ex parte* communications between the defense counsel and his treating physicians.

Scott asked the court to strike the February 21 and May 5, 2003, reports prepared by Dr. Richard Dowell, Jr.

On May 14, 2003, proceedings were held on Scott's petition and motion to strike. After hearing arguments from both Scott and DMI, the compensation court overruled the motion to strike. The parties then entered into numerous stipulations, including that Scott was employed by DMI on the day of the accident, that the accident arose out of and in the course of such employment, that DMI received timely notice of the accident, that Scott sustained "some form of injury," and that the payment records offered into evidence accurately reflected payments which were made by DMI to Scott and were relative to the accident. The parties then entered numerous exhibits, including medical records, into evidence. That evidence will be discussed at more length, as necessary, in the analysis portion of this opinion.

Scott first called Veda Brown to testify on his behalf. Brown testified that she lived with Scott and that they had known each other since they were 16 years old. Brown said that she had corresponded with Scott while he was in Vietnam. Brown was not in contact again with Scott until the 1980's, and she has lived with Scott since 1995. Brown testified that prior to Scott's 1997 accident, he was "funny, [would] tell jokes, [and] took care of himself, his business, his apartment, shopping, all of those things, going out and stuff like that." Brown said that prior to the accident, Scott was employed, did not have any anger problems, was easy to get along with, was not paranoid, and had no problems sleeping. Brown testified that she saw Scott approximately 3 weeks after his 1997 accident, and she described his condition as follows: "He

couldn't move. He had a — like a cast on his right, all on this side, and bandages all on his leg. And the scar he had like — looked like they had done something right here. He had a tooth missing, scrapes and stuff on his elbow." Brown said that after the accident, Scott "wasn't the same person" and "seemed down."

Brown testified that after Scott was released from the hospital following the 1997 accident, he needed her assistance with getting around, bathing, using the bathroom, and changing his bandages. She said that his demeanor had changed and that he was angry and hard to be around after being released from the hospital. She also said that he was paranoid and argumentative and that he had not been this way prior to the accident. Brown testified that Scott began to feel as if someone were watching him and listening to him. She further testified that after the 1997 accident, Scott's memory had gotten worse. For example, after he ate, he did not remember what he had eaten. Additionally, Scott's sleep patterns changed in that after the accident, "he would get very warm, and [would be] jumping in his sleep, mumbling, restless, up in the nighttime smoking cigarettes." Brown testified that Scott would be unable to live on his own and that she handled his money, his clothing, and his paperwork.

On cross-examination, Brown testified that prior to 1995, she lived in New York and Scott lived in California. She said that she had not lived with Scott prior to 1995 but that she was "familiar with [Scott's] behavior from — on a day-to-day basis, a living-together basis from substantially September of 1995 to the [time of the hearing]." She said that she had attended approximately 20 of Scott's medical appointments since the time of the 1997 accident and that to her knowledge, Scott had been honest when explaining symptoms and problems to doctors. She said that prior to 1997, Scott had not complained to her about anger, sleep, or memory problems. Brown said that prior to the 1997 accident, she did not have to "take care of" Scott. Brown further stated that from July 1996 until June 1997, she had ridden along with Scott every day when he was driving his truck.

Brown testified that Scott was in another accident in 1998 but that his memory and behavior did not change as a result of that accident. She said that the 1998 accident mainly caused Scott to have pain in his shoulder. DMI's counsel asked Brown if Scott,

"in his medical reports or in his medical treatment[,] reported that he was having increased memory loss since the 1998 accident, and increased problems with concentration, neck pain, back pain, and bilateral knee pain, in addition to the shoulder, would that be different than your understanding." Brown replied that "[Scott's] memory, that's been like that since [19]97. That's an ongoing thing with him. . . . And him being paranoid and having a problem sleeping and all of that, that was before the [19]98 accident." On redirect examination, Brown clarified that Scott injured his left shoulder in the 1998 accident and that he injured his right rotator cuff in the 1997 accident.

Scott then testified in his own behalf. Scott testified that he was in the U.S. Army from 1968 until 1974 and that he was stationed in Vietnam during part of that time. While he was serving in the Army, he was awarded the Purple Heart, as well as other medals of commendation. He was honorably discharged from the Army, and he indicated that from the time of his discharge until the 1997 accident, he was "continually employed." Scott worked as a pipefitter before becoming an over-the-road truckdriver. Scott said that he was working for DMI when he was involved in the 1997 accident, which he described as follows:

> I arrived to my drop off point and the business was closed. So I locked up my truck, went about — I went down the road to get something to eat. Came out. I was walking back to my truck. And I saw headlights about five feet from me. I woke up. I was in the hospital.

He said that he lost consciousness for a short time and that he does not have a "real clear recollection of the events following the accident."

Scott said that as a result of the 1997 accident, he suffered a broken leg, a dislocated right shoulder, a torn rotator cuff, an injury to his right cheek requiring stitches, and a loud ringing in his right ear. Scott underwent numerous surgeries after the 1997 accident. When asked if he suffered any psychological injuries in the 1997 accident, Scott replied that he forgets things, has mood swings, and prefers not to be around people. He further testified that anymore, he does not trust people, does not like being in crowded stores, and does not have patience. He claimed that he did not have those problems prior to the 1997 accident. Scott

testified that he continues to have physical problems related to the 1997 accident, such as severe pain in his right knee and ankle. He said that when he sees the scars on his legs, it brings back memories of the accident and it "makes me agitated. . . . It makes me remember back, all the pain and treatments I had. And it makes me angry." He further testified that he still has problems with his right shoulder.

Scott testified that he was in another accident in 1998, when a car in which he was riding was struck by another vehicle. In the 1998 accident, he injured his left shoulder and his left knee and he banged his head. The accident also made his right leg, right shoulder, and neck sore. Scott said that in the 1998 accident, the most significant injury was to his left shoulder, and that his left shoulder was not injured in the 1997 accident. He said that it took about 1 year for him to recover from the injuries he sustained in the 1998 accident. Scott testified that after his recovery from the 1998 accident, his right leg and right shoulder "felt the same way it did before that [19]98 accident."

Scott then testified about his experiences in Vietnam. He said that it was difficult for him to discuss his time in Vietnam and that he sustained injuries while he was there. Scott had stepped on three landmines, thereby suffering cuts, a perforated eardrum, and injuries to his left knee. He also witnessed other soldiers being wounded or killed. When asked if he had been honest when giving the history of his Vietnam experiences to doctors, Scott replied: "If it didn't hurt me too much at that time to speak about it, I would talk. But if it really aggravated me, I wouldn't say [any]thing unless I was asked." He sought treatment at the Veterans' Administration (VA) hospital in Philadelphia, Pennsylvania, after he was discharged, and he was diagnosed with posttraumatic stress disorder (PTSD). Scott testified that in the mid-1980's, he was having problems with his PTSD but was able to work full time despite the problems. He testified that since the 1997 accident, his PTSD symptoms had worsened. Scott testified:

> I suffer mood swings. I wake up at night in a cold sweat. I wake up at night thinking I'm in the truck, standing on the running boards urinating. . . . I don't like to be around people.

. . . .

 I often have thoughts of people watching me. I don't like
 loud noises. Loud noises really startle me.
Scott testified that he is "not the same person [he] was before the
accident at all, physically or mentally."

 Scott said that he began to notice the worsening of his PTSD
symptoms when he got out of the hospital following the 1997
accident. He testified that at such time, he became angry, dis-
trusted people, and began to have nightmares. Scott said that he
was taking thyroid medication, sleeping aids, and medication for
his paranoia and mood swings, but that prior to his 1997 acci-
dent, he was not taking any medication. In addition, Scott testi-
fied that his memory has gotten worse since the 1997 accident
and that he has trouble remembering things such as his telephone
number or directions. Scott also testified that he has trouble con-
centrating and that this problem began after the 1997 accident as
well. Scott said that although he would like to work, he has been
unable to work since the 1997 accident. Scott testified that he had
attempted to be truthful and honest with the doctors who had
treated him since 1997 and that while he had never intentionally
misled them, he might have forgotten to mention things.

 On cross-examination, Scott testified that since 2000, he has
sought treatment through the VA for his PTSD, and that his dis-
ability has been raised from 10 to 70 percent as a result of his
PTSD symptoms. He denied that he had ever received treatment
through the VA for injuries to his right leg. He also denied hav-
ing nightly nightmares prior to the 1997 accident, although he
conceded that he had received treatment through the VA as
recently as 1995 for nightmares. Scott said that he could not
remember if prior to the 1997 accident he received any treat-
ment through the VA for problems with anger and distrust of
people. Scott also conceded that he struck his head in the 1998
accident, but he stated that it did not render him unconscious.
Scott conceded that prior to the 1997 accident, he did receive
treatment through the VA for depression and PTSD. Scott fur-
ther testified that he was not having memory problems prior to
the 1997 accident.

 On redirect examination, Scott reiterated that while he had
suffered from PTSD for a long while, he had been able to work

through the symptoms until the 1997 accident. On recross-examination, Scott conceded that prior to the 1998 accident, he had hoped to one day return to work, and that while records showed he took a functional capacity examination prior to the 1998 accident, he did not recall taking the examination.

DMI first called James Rogers, a vocational counselor, to testify on its behalf. The parties stipulated that Rogers is an expert in the field of vocational rehabilitation. Rogers said that he interviewed Scott and examined medical reports and records in the instant case. Rogers testified that he had prior experience dealing with cases involving brain injuries. Rogers said that he prepared one loss of earning capacity analysis in which he found that Scott had a 60- to 65-percent loss of earning capacity, based on member impairments to his right arm and right leg. Rogers was asked if he "rendered an opinion as to what [Scott's] status was in the world at the time [Rogers] evaluated [Scott], but without regard to what put [Scott] there," and Rogers replied in the affirmative. Rogers also testified that he did not believe that he had examined medical records or reports regarding Scott's 1998 accident.

Rogers next testified that he had recently changed his opinion regarding Scott's employability and that he now believed Scott to be unemployable. Rogers said that this opinion was based partially on a 2003 functional capacity evaluation, and he conceded that he made no effort to "distinguish any permanent or any impairment or any restrictions that may — from that [functional capacity evaluation], that may have been attributable to . . . Scott's war injuries or from his 1998 accident." Rogers also said that in concluding Scott was unemployable, Rogers considered both Scott's physical capabilities and his psychological and psychiatric status. Finally, Rogers said that he was not able to establish a causative link between Scott's disability status and the 1997 accident; Rogers also agreed that no vocational counselor could render an opinion on causation.

On cross-examination, Rogers said that he had ample information available to him in the instant case and that he did not feel any additional information or documentation was necessary in order to assist him in formulating an opinion. Rogers testified he believes that the overwhelming evidence shows Scott is unemployable and that "[t]his is due to a combination of [Scott's]

PTSD, age, below average intellect, and physical problems." Rogers said that none of the testimony given at the hearing changed his opinion.

DMI next called Karen Stricklett to testify on its behalf. Stricklett said that she is a vocational rehabilitation counselor and that she had been asked to prepare a rebuttal report concerning Scott. Stricklett said that based on the records she reviewed, she was able to provide an opinion with a reasonable degree of vocational certainty. Stricklett's reviews of the medical records and her opinions are contained in her report and will be discussed as necessary in the analysis section of this opinion.

The court entered its award on August 29, 2003. The court found as follows with regard to the accident:

> Following [Scott's] accident, he was hospitalized in Deaconness Hospital in Evansville, Indiana, through September 12, 1997, with diagnoses of multiple trauma with multiple face injuries, traumatic dislocation of right shoulder with an associated rotator cuff tear, multiple contusions, abrasions and lacerations and a Grade III open tibia and fibula fracture with significant soft tissue loss . . . . [Scott] was then transferred to Williamsport Hospital, where he came under the care of Dr. Richard Straley, who has remained his treating physician. Prior to transfer from the Deaconness Hospital, [Scott] underwent surgical repair of his right leg including the application of an external fixator and internal rod along with skin grafts, a rotator cuff repair, and repair of facial abrasions . . . .

> Early in his treatment, first noted on November 14, 1997, [Scott] reported an increase in his memory loss and requested a referral to a psychiatrist . . . . [Scott] has consistently made such complaints throughout his treatment with Dr. Straley.

> It is uncontested that [Scott] suffered from pre-existing [PTSD]. He served four years in Vietnam in the army and was wounded on several occasions. He also witnessed a number of his unit members fall victim to land mines. However, [Scott] was able to work consistently since his discharge from the service, and had not sought treatment from the [VA] for his [PTSD] since the late 1980's.

[Scott] has presented ample evidence, which the court finds to be persuasive, that he suffered an aggravation of his [PTSD] as a result of the accident and injury on August 18, 1997. In making this finding, the court relies upon the reports of Dr. Terri L. Calvert . . . , Dr. Jack Stark . . . , and Dr. [LaRue] Montanye . . . . It is the consensus of these professionals that [Scott] has not only suffered an aggravation of the PTSD, but that as a result, he has been rendered virtually unemployable.

[Scott] has been also evaluated by experts retained by [DMI], and the court has considered the opinions offered by Drs. [Jerry] Sweet and Dowell, as well as the balance of the medical evidence. However, as stated above, the court finds the opinions of the experts presented by [Scott] to be persuasive.

[Scott] has also offered the opinion of . . . Rogers, a vocational expert, who conducted a review of all the medical records presented to him by the parties. . . . It is apparent that . . . Rogers has considered the reports of the medical and psychological professionals, as well as the functional capacity evaluations, which [Scott] has undergone. As a result, . . . Rogers has offered the opinion that [Scott] is at best an odd-lot worker, perhaps capable of working in a sheltered environment.

[DMI] has presented the report of . . . Stricklett and as a presumable defense, her testimony that it is not possible for a vocational expert to attribute [Scott's] current employ - ability status to the August 18, 1997, accident and injury. The court would suggest that such a determination is the province of the court, and the court is presented with ample evidence to make that causal connection.

The court has also considered the fact that [Scott] was involved in an additional motor vehicle accident in August, 1998. In that accident, he suffered an injury to his neck and left shoulder in particular. While representing an intervening event, certainly the court believes [Scott] has presented ample evidence from Dr. Straley that the August 1998 motor vehicle accident did not cause further injury to his right shoulder or worsen his right leg injury. Nor did [Scott]

suffer any additional head injury above what had occurred in August 1997.

The court relies upon the opinions of Dr. Montanye, in finding that [Scott] became permanently and totally disabled on August 9, 1999. On that date, it was Dr. Montanye's opinion that [Scott's] prognosis for employment was poor and that his prognosis for employment in a sheltered environment was fair to average. Dr. Straley offered the opinion . . . that [Scott] was at maximum medical improvement as of October 11, 1999.

DMI appealed to the review panel, which held a review hearing on May 13, 2004. In its "Order of Remand and Reversal in Part on Review," the review panel concluded, "The degree of incapacitation and whether such was due to [Scott's] Vietnam experience, the accident of August 18, 1997, or a subsequent automobile accident of August 1998, are central to the finding by the trial court that [Scott] is now permanently and totally disabled." The review panel found that "[t]he trial court believed, and made a finding of fact in the Award of August 29, 2003, that [Scott] 'had not sought treatment from the [VA] for his [PTSD] since the late 1980's.' " The review panel then stated, "However, the evidence established that in fact [Scott] was evaluated and treated at the VA Medical Centers in Compton, and Long Beach, California, from 1990 through 1995 regarding [PTSD] and additional medical issues." The review panel noted, "The degree of preexisting PTSD and [Scott's] history of treatment and its [e]ffect on [him] is so critical to a final determination regarding [his] status we believe the case should be remanded so the trial court may re-weigh the evidence, aware of [Scott's] history of treatment."

The review panel further found that the trial court did err when it calculated Scott's average weekly wage in that the trial court had improperly excluded 3 weeks' wages from the average weekly wage calculation, because "[n]o testimony in the present case offered a sufficient explanation regarding the weeks in question to cause exclusion." The review panel also concluded that the trial court used the wrong statutory maximum benefit, noting that "the statutory maximum weekly rate in 1997 was $427.00 rather than $444.00." Finally, the review panel affirmed the ruling of the trial court denying Scott's motion to strike portions of

Dr. Dowell's testimony due to a violation of the physician-patient privilege.

In a "Concurrence in Part and Dissent in Part," one member of the review panel found the following:

> In Heiliger v. Walters & Heiliger Electric, Inc., 236 Neb. 459, 461 N.W.2d 565 (1990) the Nebraska Supreme Court stated that an employee is entitled to an award when the injuries suffered in an accident combine with the pre-existing condition or disability and further that there is no allocation of disability attributable to a work-related injury and disability attributable to an antecedent or pre-existing condition. The plaintiff in this case had pre-existing [PTSD] which, when combined with the injuries he suffered in the accident, leaves him totally disabled. This is true even if the accident did not aggravate the pre-existing [PTSD]. This is what the trial judge found and there is substantial evidence in the record to support the trial judge. The trial judge should be affirmed on the issue of total permanent loss of earning power.

The concurrence in part further asserted that the trial court's determination of Scott's average weekly wage should be affirmed, although it agreed that the trial court's use of $444 as the statutory maximum was in error and stated that the matter should be remanded only on that issue. Scott has now appealed to this court, and DMI has cross-appealed.

## ASSIGNMENTS OF ERROR

Scott alleges, restated, that the review panel erred when it reversed the trial court's award regarding both the aggravation of Scott's PTSD and his average weekly wage and when it failed to reverse the trial court's ruling regarding the portions of Dr. Dowell's testimony which were obtained ex parte. On cross-appeal, DMI contends that the review panel erred when it remanded the cause back to the trial court without ruling on all issues raised by DMI on appeal and when it failed to find that the trial court had not issued a reasoned decision.

## STANDARD OF REVIEW

An appellate court may modify, reverse, or set aside a Workers' Compensation Court decision only when (1) the

compensation court acted without or in excess of its powers; (2) the judgment, order, or award was procured by fraud; (3) there is not sufficient competent evidence in the record to warrant the making of the order, judgment, or award; or (4) the findings of fact by the compensation court did not support the order or award. *Ludwick v. TriWest Healthcare Alliance*, 267 Neb. 887, 678 N.W.2d 517 (2004).

■ In determining whether to affirm, modify, reverse, or set aside a judgment of the Workers' Compensation Court review panel, a higher appellate court reviews the findings of the trial judge who conducted the original hearing. *Id.*

■ Upon appellate review, the findings of fact made by the trial judge of the compensation court have the effect of a jury verdict and will not be disturbed unless clearly wrong. *Id.*

■ An appellate court is obligated in workers' compensation cases to make its own determinations as to questions of law. *Id.*

## ANALYSIS

*Aggravation of PTSD.*

Scott first alleges that the review panel erred when it reversed the trial court's determination regarding the aggravation of his PTSD. In its "Order of Remand and Reversal in Part on Review," the review panel found:

> The trial court believed, and made a finding of fact in the Award of August 29, 2003, that [Scott] "had not sought treatment from the [VA] for his [PTSD] since the late 1980's." . . . However, the evidence established that in fact [Scott] was evaluated and treated at the VA Medical Centers in Compton, and Long Beach, California, from 1990 through 1995 regarding [PTSD] and additional medical issues. . . . The degree of preexisting PTSD and [Scott's] history of treatment and its [e]ffect on [him] is so critical to a final determination regarding [his] status we believe the case should be remanded so the trial court may re-weigh the evidence, aware of [Scott's] history of treatment.

Scott alleges that "there is ample evidence in the record to support the findings made by [the trial judge]" and that the review panel should have affirmed the trial court's findings. Brief for appellant at 19.

The trial court, in its award, made the following findings with regard to Scott's PTSD:

> It is uncontested that [Scott] suffered from pre-existing [PTSD]. He served four years in Vietnam in the army and was wounded on several occasions. He also witnessed a number of his unit members fall victim to land mines. However, [Scott] was able to work consistently since his discharge from the service, and had not sought treatment from the [VA] for his [PTSD] since the late 1980's.
>
> [Scott] has presented ample evidence, which the court finds to be persuasive, that he suffered an aggravation of his [PTSD] as a result of the accident and injury on August 18, 1997. In making this finding, the court relies upon the reports of Dr. Terri L. Calvert . . . , Dr. Jack Stark . . . , and Dr. [LaRue] Montanye . . . . It is the consensus of these professionals that [Scott] has not only suffered an aggravation of the PTSD, but that as a result, he has been rendered virtually unemployable.

In determining whether to affirm, modify, reverse, or set aside a judgment of the Workers' Compensation Court review panel, a higher appellate court reviews the findings of the trial judge who conducted the original hearing. *Ludwick v. TriWest Healthcare Alliance*, 267 Neb. 887, 678 N.W.2d 517 (2004). Upon appellate review, the findings of fact made by the trial judge of the compensation court have the effect of a jury verdict and will not be disturbed unless clearly wrong. *Id.*

The record is clear that Scott did in fact receive some treatment for his preexisting PTSD during the early- to mid-1990's. The trial court erroneously noted that he had not been treated for his preexisting PTSD since the late 1980's. We agree with the review panel that "[t]he degree of preexisting PTSD and [Scott's] history of treatment and its [e]ffect on [him] is . . . critical to a final determination regarding [his] status." Thus, we affirm the review panel's determination that the matter should be remanded to the trial court "so the trial court may re-weigh the evidence, aware of [Scott's] history of treatment."

*Average Weekly Wage.*

Scott next alleges that the review panel erred when it found that "the trial court erred regarding the calculation of the average

weekly wage and [Scott's] temporary and permanent indemnity rates." In its award, the trial court found as follows:

> At the time of said accident and injury, [Scott] was receiving an average weekly wage of $672.98 being sufficient to entitle him to benefits of $444.00 (the statutory maximum) per week for 103 weeks of temporary total disability, and thereafter, and in addition thereto a like sum each week from August 10, 1999, through the date of the hearing herein, and for so long in the future as [Scott] remains permanently and totally disabled. [Scott] is also entitled to $444.00 per week for 6.75 weeks for a 3 percent permanent partial disability to his right arm, and a like sum each week for 68.8 weeks for a 32 percent permanent partial disability to his right leg. The court relies upon the calculation presented by [Scott] to ascertain [his] average weekly wage.

The review panel found that under *Canas v. Maryland Cas. Co.*, 236 Neb. 164, 459 N.W.2d 533 (1990), the trial court should "exclude 'abnormally low work weeks'" from the calculation of a worker's average weekly wage but that "[n]o testimony in the present case offered a sufficient explanation regarding the weeks in question to cause exclusion." The review panel then stated: "[T]he finding regarding average weekly wage [should be] reversed and remanded for re-calculation. Further, the statutory maximum weekly rate in 1997 was $427.00 rather than $444.00."

In *Canas, supra*, the Nebraska Supreme Court found that "the Legislature sought to exclude those abnormally low workweeks from the 26-week period used for the calculation." *Id.* at 168, 459 N.W.2d at 537. Nowhere in *Canas* does the Nebraska Supreme Court suggest that a trial court cannot examine a worker's wage statement and exclude abnormally low workweeks without testimony regarding why the workweeks were abnormally low. In the instant case, although there was no testimony explaining abnormally low workweeks, Scott's wage statement for the previous 6 months was introduced into evidence. The trial court examined Scott's wages for the 6 months preceding his work-related accident, excluded those weeks that it found to be abnormally low, and calculated Scott's average weekly wage. This was a finding

of fact made by the trial court, and it was not clearly erroneous. Therefore, we reverse the finding of the review panel and instead hold that the trial court's finding regarding the calculation of Scott's average weekly wage should be affirmed.

Additionally, both parties agree that the statutory maximum weekly rate in 1997 was $427 rather than $444. Accordingly, the matter must be remanded to the review panel for remand to the trial court, with directions to amend its award to show that Scott is entitled to benefits of $427 per week rather than $444 per week, should the trial court determine that Scott is entitled to benefits.

*Information Obtained Ex Parte.*

Scott next alleges that the review panel erred when it failed to reverse the trial court's ruling regarding the portions of Dr. Dowell's testimony which were obtained ex parte. Scott contends that the "physician/patient privilege precludes an employer or its legal representative from contacting [a] plaintiff's treating health care provider *ex parte*." Brief for appellant at 29.

Scott's argument is misplaced. Neb. Rev. Stat. § 48-120(4) (Supp. 2005) provides, in relevant part:

> All medical and hospital information relevant to the particular injury shall, on demand, be made available to the employer, the employee, the workers' compensation insurer, and the compensation court. The party requesting such medical and hospital information shall pay the cost thereof. No such relevant information developed in connection with treatment or examination for which compensation is sought shall be considered a privileged communication for purposes of a workers' compensation claim.

In the absence of anything to the contrary, statutory language is to be given its plain and ordinary meaning. An appellate court will not resort to interpretation to ascertain the meaning of statutory words which are plain, direct, and unambiguous. *Salazar v. Scotts Bluff Cty.*, 266 Neb. 444, 665 N.W.2d 659 (2003).

The meaning of § 48-120(4) is plain and unambiguous. When an injured worker is seeking compensation for an injury from his employer and the employer seeks relevant information from the injured worker's treating physician regarding that injury, that information is not privileged. This assignment of error is without merit.

*DMI's Cross-Appeal.*

On cross-appeal, DMI alleges that "[t]he review panel erred in remanding rather than ruling on all issues raised on appeal from the trial court by [DMI]." Brief for appellee on cross-appeal at 44. The review panel, in its order, held that "[m]ost of [DMI's] other assignments of error are related to the PTSD issue and it is premature to address those allegations of error pending the trial court's redetermination regarding aggravation of that preexisting condition." DMI's allegations of error revolve around the trial court's factual findings, and we determine that the review panel was correct when it found that it would be premature to address DMI's additional allegations of error prior to the trial court's reweighing of the evidence presented to it on remand. This assignment of error is therefore without merit.

## CONCLUSION

The trial court's factual finding that Scott had not been treated for his PTSD since the late 1980's was clearly erroneous. We find that the review panel properly reversed this finding and remanded the cause for the trial court to reweigh the evidence in light of Scott's history of treatment. We further find that the trial court properly calculated Scott's average weekly wage, but we find that the trial court used the incorrect statutory maximum wage rate. Additionally, the review panel correctly held that Scott's medical information received by DMI from Dr. Dowell was not protected by physician-patient privilege. Finally, we hold that the review panel correctly determined that it was premature to address the issues presented by DMI on cross-appeal, because the matter needed to be remanded to the trial court for a reweighing of the evidence presented. Therefore, the matter is remanded to the review panel for remand to the trial court with directions consistent with this opinion.

AFFIRMED IN PART, AND IN PART REVERSED
AND REMANDED WITH DIRECTIONS.

IRWIN, Judge, dissenting in part.

Although I agree with the majority's conclusions in most respects, I respectfully dissent from that portion of the majority opinion which reverses the review panel's holding concerning Scott's average weekly wage. I agree with the review panel that

" 'abnormally low work weeks' " may be excluded from the compensation court's calculation of the average weekly wage only when the record presents a sufficient explanation regarding the weeks in question. I respectfully disagree from the majority's conclusion that "[n]owhere in *Canas* [*v. Maryland Cas. Co.*, 236 Neb. 164, 459 N.W.2d 533 (1990),] does the Nebraska Supreme Court suggest that a trial court cannot examine a worker's wage statement and exclude abnormally low workweeks without testimony regarding why the workweeks were abnormally low."

In *Canas*, the issue specifically presented to the Nebraska Supreme Court was not whether certain weeks should be excluded from the average weekly wage calculation, but, rather, how the compensation court should "average" the employee's weekly wage during the relevant weeks. Nonetheless, in recognizing that certain weeks in that case should be excluded, the court stated:

> In the 26 weeks preceding the accident, each of [the employee's] workweeks was not less than 44.03 hours or more than 50.87 hours, with seven exceptions. *In those 7 weeks, [the employee] worked 20.77, 37.43, 34.75, 14.35, 36.63, 7.78, and 36.75 hours, respectively. It is uncontroverted that [the employee's] shortened workweeks were due to vacation time incurred in moving his family from Texas to Nebraska, sick leave, and holidays.*

(Emphasis supplied.) *Id.* at 167, 459 N.W.2d at 536-37. Although not essential to the holding in *Canas*, the court specifically recited evidence in the record which explained why those specific workweeks were abnormally low.

Similarly, in *Clifford v. Harchelroad Chevrolet*, 229 Neb. 78, 425 N.W.2d 331 (1988), the Nebraska Supreme Court affirmed the review panel's holding in which it excluded from the average weekly wage calculation certain weeks as abnormally low workweeks. A review of the opinion in *Clifford*, however, indicates that the court recognized that most of the excluded weeks were during a time period when the employee's illness prevented him from working. After examining two specific exhibits, the court noted that the specific weeks should be excluded. Again, the court's discussion suggests that the exhibits demonstrated a reason for the abnormally low workweeks and recognizes that the bulk of them

were due to illness. Although the suggestion was, again, not central to the court's holding, the court's discussion in *Clifford* further suggests that the record should include some explanation for an abnormally low workweek before the week should be excluded from the average weekly wage calculation.

Although I recognize that no opinion of the Nebraska Supreme Court specifically holds that the record must contain an explanation for an abnormally low workweek before that week may be excluded from the average weekly wage calculation, I also note that the majority points to no authority specifically holding that such is not required. Inasmuch as there is no specific holding of the Nebraska Supreme Court on this matter, I look to the discussion in both *Canas* and *Clifford* and see, at the very least, a suggestion that such is required. Accordingly, I would affirm the review panel's holding on this issue.