BARBARA MORRIS, APPELLEE, V. NEBRASKA HEALTH SYSTEM, APPELLANT, AND SEDGWICK CLAIMS MANAGEMENT SERVICES, INC., AND UNIVERSITY OF NEBRASKA MEDICAL CENTER, APPELLEES.

664 N.W.2d 436

Filed July 11, 2003.   No. S-01-1194.

Robert D. Mullin, Jr., and William J. Birkel, of McGrath, North, Mullin & Kratz, for appellant.

James E. Harris and Britany S. Shotkoski, of Harris, Feldman Law Offices, for appellee Barbara Morris.

Don Stenberg, Attorney General, and Hobert B. Rupe for appellee University of Nebraska Medical Center.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, McCORMACK, and MILLER-LERMAN, JJ.

HENDRY, C.J.

## INTRODUCTION

Nebraska Health System (NHS) seeks further review of the decision of the Nebraska Court of Appeals in *Morris v. Nebraska Health System*, No. A-01-1194, 2002 WL 31360609 (Neb. App. Oct. 22, 2002) (not designated for permanent publication). NHS contends the Court of Appeals erred in affirming the trial judge's finding that Barbara Morris' date of injury was the day she ceased employment with NHS due to her latex allergy. NHS also contends the Court of Appeals erred in affirming the trial judge's finding that Morris' last injurious exposure to latex occurred while employed by NHS.

## FACTUAL BACKGROUND

Morris was initially employed by the University of Nebraska Medical Center (UNMC) from 1983 through 1991. She did not

work full time in 1992 and 1993 due to reasons unrelated to the issues in this case. In 1993, Morris returned to work at UNMC in the radiation oncology department. In June 1998, UNMC and Clarkson Hospital merged to form NHS. Although Morris continued working in the same position after the merger, her employer was now NHS.

In 1994, Morris reduced her work schedule to 32 hours per week, as she was experiencing fatigue and shortness of breath. In the spring of 1998, prior to commencing employment with NHS, Morris further limited her work schedule to 24 hours per week due to continuing symptoms later associated with a latex allergy. On October 9, 1998, while performing employment-related functions, Morris suffered a reaction to latex that required her to go to the emergency room to receive medical treatment. Morris ceased employment with NHS after this incident.

Morris subsequently filed a petition seeking benefits with the compensation court. A hearing was held on November 27, 2000. Morris testified and submitted, inter alia, medical records of several doctors who treated her, as well as a vocational rehabilitation counselor's evaluation and earnings capacity assessment. At this hearing, the parties stipulated that Morris suffered from a "Type I" work-related latex allergy.

Morris testified that while working at UNMC in the 1980's, her hands would break out in a rash after being exposed to the powder in latex gloves. As early as 1994, Morris began experiencing fatigue and shortness of breath. Morris testified that by 1996, existing gastrointestinal problems began to worsen. Prior to 1998, Morris also began experiencing hoarseness in her voice. Morris' latex allergy was first diagnosed on March 22, 1997, while she was employed by UNMC. However, the record indicates that the connection between Morris' latex allergy and her decline in health was not established until after Morris ceased employment in October 1998.

Dr. Ronald C. McGarry worked with Morris in the radiation oncology department and was also one of Morris' treating physicians. Dr. McGarry stated in a letter dated October 28, 1998, that Morris' latex allergy would have a "negative impact on her ability . . . to earn a good livelihood." Dr. McGarry also stated that "other employment will be difficult to obtain without exposure to

the wide variety of latex-like compounds in the environment." In a second letter, dated April 8, 2000, Dr. McGarry indicated that he worked closely with Morris until she withdrew from the radiation oncology department due to her health and that he had "directly observed her problems and [knew of] her high titre of reactivity to latex." Dr. McGarry also reiterated his concern that Morris would find it difficult to "obtain employment in a safe environment." In a third letter, dated October 16, 2000, Dr. McGarry again indicated he had the opportunity to directly observe Morris' "decline in health," and opined that Morris' latex allergy "makes it all but impossible for her to perform her nursing career."

Finally, in a report dated October 16, 2000, the vocational rehabilitation counselor opined that Morris was an "odd lot worker, since suitable work would not be regularly and continuously available to her."

On February 21, 2001, the trial judge of the Workers' Compensation Court entered an award finding that Morris' disability began on October 9, 1998, while she was employed by NHS. Although finding that Morris was first diagnosed with a latex allergy while employed by UNMC, the judge determined that Morris "sustained an accident and injury on October 9, 1998, at the time she was employed by [NHS]" and that as a result, Morris was permanently and totally disabled.

On October 3, 2001, a review panel of the compensation court affirmed the trial judge's decision. NHS timely appealed, and the Court of Appeals affirmed in an unpublished opinion. *Morris v. Nebraska Health System*, No. A-01-1194, 2002 WL 31360609 (Neb. App. Oct. 22, 2002) (not designated for permanent publication). In that opinion, the Court of Appeals determined that the date of injury in an occupational disease case is the date on which the employee's diagnosed condition progresses to the point where his or her employment, or type of employment, ceases. Therefore, the Court of Appeals concluded that the trial judge was not clearly wrong in finding that Morris' date of injury was October 9, 1998. The Court of Appeals further determined that Morris' last injurious exposure to latex occurred on that same date, which was during her employment with NHS. NHS petitioned for further review, which this court granted.

## ASSIGNMENTS OF ERROR

NHS contends, rephrased, that the Court of Appeals erred in affirming the trial judge's findings that (1) Morris' injury date was October 9, 1998, and (2) Morris' October 9, 1998, exposure to latex was injurious under the "last injurious exposure" rule. NHS argues that such findings are inconsistent with our holdings in *Jordan v. Morrill County*, 258 Neb. 380, 603 N.W.2d 411 (1999), and *Vonderschmidt v. Sur-Gro*, 262 Neb. 551, 635 N.W.2d 405 (2001). NHS does not assign as error the trial judge's finding that Morris is permanently and totally disabled.

## STANDARD OF REVIEW

■ An appellate court may modify, reverse, or set aside a Workers' Compensation Court decision only when (1) the compensation court acted without or in excess of its powers; (2) the judgment, order, or award was procured by fraud; (3) there is not sufficient competent evidence in the record to warrant the making of the order, judgment, or award; or (4) the findings of fact by the compensation court did not support the order or award. *Zavala v. ConAgra Beef Co.*, 265 Neb. 188, 655 N.W.2d 692 (2003); *Vega v. Iowa Beef Processors*, 264 Neb. 282, 646 N.W.2d 643 (2002).

■ In determining whether to affirm, modify, reverse, or set aside a judgment of the Workers' Compensation Court review panel, a higher appellate court reviews the findings of the trial judge who conducted the original hearing. *Frauendorfer v. Lindsay Mfg. Co.*, 263 Neb. 237, 639 N.W.2d 125 (2002); *Vonderschmidt, supra*. Upon appellate review, the findings of fact made by the trial judge of the compensation court have the effect of a jury verdict and will not be disturbed unless clearly wrong. *Frauendorfer, supra*.

■ An appellate court is obligated in workers' compensation cases to make its own determinations as to questions of law. *Larsen v. D B Feedyards*, 264 Neb. 483, 648 N.W.2d 306 (2002); *Vega, supra*.

## ANALYSIS

### DATE OF INJURY

In its first assignment of error, NHS argues the Court of Appeals erred in affirming the trial judge's finding that the date of

Morris' injury was October 9, 1998. NHS contends that in so determining, the Court of Appeals erroneously established a new standard for the determination of the date of injury in an occupational disease case.

We first addressed the date of injury in an occupational disease case in *Hauff v. Kimball*, 163 Neb. 55, 77 N.W.2d 683 (1956). We stated that

> "[w]here an occupational disease results from the continual absorption of small quantities of some deleterious substance from the environment of the employment over a considerable period of time, an afflicted employee can be held to be 'injured' only when the accumulated effects of the substance manifest themselves, which is when the employee becomes disabled and entitled to compensation; and the 'date of injury', within the meaning of the Workmen's Compensation Act, is the date when the disability is first incurred, and the six months' period of limitations runs from that date and not from the time the employee has knowledge of the disease."

163 Neb. at 61, 77 N.W.2d at 687. We concluded that under the facts presented, Hauff's injury, thus his disability, manifested itself in July 1954, when Hauff was prohibited from continuing his employment due to employment-related pneumoconiosis silicosis.

Similarly, in *Osteen v. A. C. and S., Inc.*, 209 Neb. 282, 307 N.W.2d 514 (1981), we concluded that Osteen's disability manifested itself on the day he entered the hospital, February 1, 1977. That date was Osteen's last day at work, as he was subsequently unable to continue in his employment due to an abdominal disorder, later determined to be employment-related peritoneal mesothelioma.

We were again faced with determining when an employee's occupational disease manifested itself in disability in *Hull v. Aetna Ins. Co.*, 247 Neb. 713, 529 N.W.2d 783 (1995). We concluded that "the date that determines liability is the date that the employee becomes disabled from rendering further service." *Id.* at 719, 529 N.W.2d at 789 (citing *Lowery v. McCormick Asbestos Co.*, 300 Md. 28, 475 A.2d 1168 (1984)). We then determined that Hull's disability manifested itself in March 1989, despite the fact

that Hull continued to work limited hours in his practice of dentistry until January 1991. Our determination was based on the fact that it was in March 1989 that both Hull's dermatologist and pulmonary specialist advised him that he should cease working due to his contact dermatitis and pulmonary problems. See, also, *Ross v. Baldwin Filters*, 5 Neb. App. 194, 557 N.W.2d 368 (1996).

When considered collectively, *Hauff*, *Osteen*, and *Hull* set forth the rule that in an occupational disease context, the "date of injury" is that date upon which the accumulated effects of the disease manifest themselves to the point the injured worker is no longer able to render further service. It is on that date that the occupational disease is said to manifest itself to the level of disability permitting recovery for an occupational disease pursuant to the Nebraska Workers' Compensation Act. Given the records before this court in *Hauff* and *Osteen*, the "date of injury" happened to coincide with the actual date the respective workers ceased employment, as there was no medical evidence to suggest that either worker was advised to cease employment prior to such date. In *Hull*, the date of injury was determined to be March 13, 1989, the date Hull's dermatologist recommended that Hull cease practicing dentistry, even though Hull continued his practice on a reduced basis until 1991. See, also, *Watson v. Omaha Pub. Power Dist.*, 9 Neb. App. 909, 622 N.W.2d 163 (2001) (date of disability was date on which worker's employment with prior employer ceased due to testimony indicating that worker was unable to again obtain work in that field due to medical restrictions); *Ross, supra* (date of disability was determined to be date on which it was recommended that worker cease employment due to occupational disease).

The record in this case reveals that while Morris modified her working conditions due to her latex allergy, she was able to continue working until October 9, 1998, when, during the performance of her duties with NHS, she suffered a reaction to latex which required her to go to the emergency room for treatment. It was only after this exposure that the causal connection between Morris' latex allergy and her symptoms was finally made by her physicians and that she ceased employment with NHS. The record also contains competent evidence to support the trial judge's determination that Morris' date of injury was

October 9, the date Morris ceased employment with NHS. As the Court of Appeals noted:

> In this case, the trial judge determined that Morris' date of injury was October 9, 1998, because "[i]t was at that time that [Morris'] claimed condition progressed to the point where she could no longer continue her employment, even at reduced hours." Morris could no longer work as a nurse as of October 9. The medical evidence establishes that it would be "all but impossible for [Morris] to perform her nursing career." Additionally, the evidence shows it would be difficult for Morris to find *any* job because of the wide variety of latex compounds in the environment.

*Morris v. Nebraska Health System*, No. A-01-1194, 2002 WL 31360609 at *4 (Neb. App. Oct. 22, 2002) (not designated for permanent publication).

NHS contends, however, that this court's decisions in *Jordan v. Morrill County*, 258 Neb. 380, 603 N.W.2d 411 (1999), and *Vonderschmidt v. Sur-Gro*, 262 Neb. 551, 635 N.W.2d 405 (2001), enunciate a new legal standard in occupational disease cases. We disagree. In *Vonderschmidt*, we stated that

> cessation of employment is a requirement regardless of whether the injury arises from an accident or an occupational disease. In either event, the injury must be such that the employee discontinues employment and seeks medical treatment. . . .
>
> . . . .
>
> Both accidental injuries and occupational diseases have specific requirements which must be met in order for compensation to be received. [Citation omitted.] One requirement is common to both. The injury must result in a disability, and the disability must be such that the employee can no longer perform the work required.

262 Neb. at 558, 635 N.W.2d at 410 (citing *Jordan, supra*). Specifically, we found in *Vonderschmidt* that a brief interruption in employment was sufficient to constitute a cessation of employment for purposes of entitlement to workers' compensation benefits in a repetitive trauma injury case. NHS argues that under the *Vonderschmidt* standard, Morris' date of injury was in 1996 or 1997, when she "stop[ped] work and [sought] medical treatment."

262 Neb. at 558, 653 N.W.2d at 410. At that time, NHS emphasizes, Morris was still employed by UNMC.

■ *Jordan* and *Vonderschmidt* are inapplicable, as they are both repetitive trauma cases. This court has consistently analyzed repetitive trauma injuries as accidents within the meaning of Neb. Rev. Stat. § 48-151(2) (Reissue 1998), rather than occupational diseases. See *Maxson v. Michael Todd & Co.*, 238 Neb. 209, 469 N.W.2d 542 (1991), *disapproved on other grounds, Jordan, supra* (analyzing repetitive trauma injuries as accident rather than occupational disease). Accordingly, our discussion in *Vonderschmidt* of the "discontinuation of employment" standard was framed in the context of establishing an identifiable point in time when an accident occurs "suddenly and violently" within the meaning of § 48-151(2). However, such an inquiry is unnecessary in an occupational disease case and, as such, has no application to the issues presented by this case. Any suggestion in either *Jordan* or *Vonderschmidt* that the "discontinuation of employment" standard is the same for both repetitive trauma and occupational disease cases is dicta and contrary to this state's line of occupational disease case law.

We determine that the Court of Appeals did not err in concluding that the trial judge of the Workers' Compensation Court was not clearly wrong in finding Morris' date of injury to be October 9, 1998. NHS' first assignment of error is without merit.

LAST INJURIOUS EXPOSURE RULE

In its second assignment of error, NHS argues the Court of Appeals erred in affirming the trial judge's conclusion that Morris' last injurious exposure to latex occurred while she was employed by NHS.

■ This court most recently discussed the last injurious exposure rule in *Hull v. Aetna Ins. Co.*, 247 Neb. 713, 720, 529 N.W.2d 783, 789 (1995):

In the case of occupational disease, liability is most frequently assigned to the carrier who was covering the risk when the disease resulted in disability, if the employment at the time of disability was of a kind contributing to the disease. The employer or insurer at the time of the most

recent exposure which bears a causal relation to the disability is generally liable for the entire compensation.

This court addressed the issue of the necessary causal relation in greater detail in *Osteen v. A. C. and S., Inc.*, 209 Neb. 282, 290-91, 307 N.W.2d 514, 520 (1981):

The last injurious exposure, to be "injurious," must indeed bear a causal relationship to the disease. However, according to the authorities, this means simply that the exposure must be *of the type which could* cause the disease, given prolonged exposure. As described in *Mathis v. State Accident Insurance Fund*, 10 Or. App. 139, 499 P.2d 1331 (1972), an exposure which will support imposition of liability under this rule need not be proved to have been a "material contributing cause" of the disease. Indeed, to so require would bring the employee back to Square One by requiring "proof of the unprovable and litigation of the unlitigable." *Holden v. Willamette Industries, Inc.*, [28 Or. App. 613, 560 P.2d 298 (1977)].

Thus, to determine Morris' last injurious exposure, we must first determine the date of disability, then search backward to find the last causal relationship between the exposure and the disability. *Hull, supra.* See 9 Arthur Larson & Lex K. Larson, Larson's Workers' Compensation Law § 153.02[1] (2003).

Having concluded that the trial judge did not err in finding Morris' date of injury, and thus the date of disability, to be October 9, 1998, we must now decide whether Morris' exposure to latex on October 9 was "of the type which could cause the disease, given prolonged exposure." See *Osteen*, 209 Neb. at 290, 307 N.W.2d at 520.

NHS contends the medical evidence with respect to Morris' latex exposure while employed by NHS was insufficient to impose liability upon NHS. In particular, NHS directs us to letters written by Dr. McGarry with respect to Morris' condition. NHS acknowledges that Dr. McGarry noted a " 'progressive worsening of [Morris'] health difficulties in the work environment.' " Brief for appellant in support of petition for further review at 6. However, NHS argues that in a letter dated April 8, 2000, Dr. McGarry stated he stopped working with Morris in mid-1998, which would have been "before the alleged latex

exposure at NHS and presumably at or before the time that Morris's employment with NHS started." *Id.* Thus, NHS argues that "[h]is letter . . . offers no support for the claim that [Morris'] October 9, 1998 latex exposure while working for NHS resulted in a permanent worsening of her condition." *Id.*

Our review of the April 8, 2000, letter, however, suggests an equally plausible meaning. In particular, that same letter goes on to state that Dr. McGarry was familiar with Morris' condition and that he "worked closely with her until her health forced her to withdraw from the department." The record is undisputed that Morris did not "withdraw" from the department until after her latex exposure on October 9, 1998. Our review of all letters authored by Dr. McGarry supports a finding that Dr. McGarry both observed and treated Morris throughout her employment with NHS and that Morris' latex allergy worsened during that period of time.

In sum, the record indicates that Morris' employment as a nurse exposed her to various latex products. Morris' undisputed testimony was that such exposure continued while in the employ of NHS. Moreover, the parties to this action stipulated that Morris' latex allergy was work related. Finally, the letters from Dr. McGarry stated, inter alia, that "by virtue of [his] extensive background in Immunology and general medical practise [sic] along with the fact that [he had] had the opportunity to directly observe . . . Morris' decline in health on multiple occasions over a period of time prior to her retirement from nursing," Dr. McGarry opined that Morris' latex allergy was "an occupationally induced problem that will prevent [Morris] from returning to her chosen profession indefinitely."

In also rejecting NHS' argument that the record did not support the trial judge's conclusion that Morris' last injurious exposure to latex occurred while employed at NHS, the Court of Appeals observed:

> NHS makes two arguments regarding why it should *not* be held liable for Morris' disability. First, NHS contends that there is no causation between the October 9, 1998, incident and Morris' disability. Second, NHS argues that Morris' allergic reaction on October 9 is only a temporary condition and not an "injurious exposure." Therefore, NHS

argues that it should not be held liable for paying Morris' benefits. NHS bases its arguments on the opinion of Dr. Mary Wampler. In a letter dated June 29, 2000, Dr. Wampler opined that Morris' exposure to latex on October 9 "resulted in a temporary aggravation of a pre-existing latex allergy." Dr. Wampler also stated that Morris' allergic reaction ceased the following day and would not recur if she did not return to work.

The trial judge recognized that Morris "exhibited most, if not all, symptoms associated with latex allergy . . . prior to June, 1998," during her employment with UNMC. But, the trial judge also found that Morris was able to continue her employment up until the incident on October 9, when Morris' condition "progressed to the point where she could no longer continue her employment.["]

The trial judge's findings are supported by Dr. McGarry's letters indicating that Morris' latex allergy over a period of time contributed to her "decline in health." The trial judge's findings are also supported by evidence that shows Morris' latex allergy worsened from her exposure to latex in the early 1980's until October 9, 1998.

*Morris v. Nebraska Health System*, No. A-01-1194, 2002 WL 31360609 at *5 (Neb. App. Oct. 22, 2002) (not designated for permanent publication).

Our review of the record leads us to the same conclusion. The record supports the trial judge's finding that Morris' October 9, 1998, exposure bore the requisite causal relationship to Morris' disability. As such, the trial judge's finding that NHS was responsible for Morris' benefits was not clearly wrong and NHS' second assignment of error is without merit.

We recognize that this conclusion may seem harsh, as Morris was employed by NHS for only approximately 5 months. However, as we have stated, "[t]he law of averages . . . will spread the costs proportionately among insurers over time." *Hull v. Aetna Ins. Co.*, 247 Neb. 713, 721, 529 N.W.2d 783, 789 (1995).

## CONCLUSION

The trial judge did not err in finding that Morris' date of injury, and thus the date of disability, was October 9, 1998. Since Morris'

employment with NHS on that date exposed her to latex, under the last injurious exposure rule, NHS was properly held liable for Morris' compensation benefits.

AFFIRMED.

STEPHAN, J., not participating.