PRESTON GRIFFIN, APPELLANT, V. DRIVERS MANAGEMENT, INC.,
A NEBRASKA CORPORATION, APPELLEE.

714 N.W.2d 749

Filed May 2, 2006.   No. A-05-995.

723

James E. Harris and Michaela Skogerboe, of Harris Kuhn Law Firm, L.L.P., for appellant.

Daniel R. Fridrich for appellee.

INBODY, Chief Judge, and IRWIN and CASSEL, Judges.

IRWIN, Judge.

## I. INTRODUCTION

Preston Griffin appeals an order of a three-judge review panel for the Nebraska Workers' Compensation Court. Griffin asserts that the review panel erred in reversing the trial court's finding of Griffin's average weekly wage, in reversing the trial court's award of penalties, in affirming the trial court's finding that

Griffin failed to prove he is permanently totally disabled, and in affirming the trial court's finding that Griffin failed to prove that a stroke and related complications were causally related to the work injury. We find that the review panel erred in reversing the trial court's finding of Griffin's average weekly wage, and we reverse that portion of the review panel's order. We remand the case to the review panel with directions to affirm the trial court's holding concerning the average weekly wage calculation. We find no merit to the remaining assertions of error, and we affirm the remainder of the review panel's order.

## II. BACKGROUND

Griffin has a history of problems with rheumatoid arthritis. The arthritis prevented Griffin from being able to work between 1998 and 2000. Griffin began taking various medications to treat the arthritis, and in 2000, he was able to return to work.

Griffin first began working for Drivers Management, Inc. (DMI), in October 2000. In March 2001, Griffin voluntarily left his employment with DMI for personal reasons. Griffin was re-hired by DMI on or about November 26, 2001. When he returned to DMI, Griffin was first required to complete a probationary period of 75 hours as a "co-driver." As a "co-driver," Griffin was required to drive with another driver and was paid a flat salary of $375 per week. In late December 2001, Griffin's status with DMI changed from "co-driver" to "company driver," in which capacity Griffin was allowed to drive by himself and was no longer on a probationary status. As a "company driver," Griffin drove more hours and was paid a contractual rate of 27 cents per mile. Griffin testified that he earned approximately $1,258 the first week he was a "company driver."

On December 31, 2001, Griffin made a delivery to a location in Oklahoma City, Oklahoma. After having his truck unloaded and having paperwork completed, Griffin was walking across a parking lot to return to his truck when he slipped and fell on some ice. Griffin suffered injuries to his right side and right hip.

Griffin received treatment at a hospital, where x rays revealed a right hip fracture. Griffin was also diagnosed with a right femoral neck fracture, and he underwent surgery. Griffin received continuing followup treatment with an orthopedic physician in Alabama, Dr. Bony Barrineau. On January 15, 2002, Dr. Barrineau

ordered Griffin to remain off work. On June 3, Dr. Barrineau performed hip surgery on Griffin.

On December 17, 2002, Griffin underwent a functional capacity evaluation. The functional capacity evaluator opined that Griffin had demonstrated activity consistent with the requirements for driving a heavy truck but that Griffin's limitations continued to include decreased muscle strength and hip pain. The evaluator recommended a road test. On December 31, Dr. Barrineau released Griffin to return to work, but Dr. Barrineau also recommended a road test.

Griffin reported to a DMI terminal in Atlanta, Georgia, in early January 2003 to return to work. Griffin testified at trial that DMI did not give him a road test, but that DMI instead gave him the keys to a truck and indicated that he would be given an assignment as soon as the truck was ready. Griffin attempted to drive the cab portion of the truck around the parking lot, but he had difficulty driving the cab, even without a loaded trailer attached. Several days later, when DMI informed Griffin that the truck was ready for an assignment, Griffin informed DMI that he was experiencing hip pain and that he was going to return home to see Dr. Barrineau. Griffin never returned to work with DMI. On January 21, Dr. Barrineau released Griffin to return to work, without restrictions, and determined that Griffin did not need further surgery.

Griffin testified that he did not feel he was capable of driving a truck and that he understood his discussion with Dr. Barrineau on January 21, 2003, to mean that it was "up to [Griffin] whether [he] could try to go back again or not." In a report dated October 28, 2004, Dr. Barrineau indicated that Griffin, like any patient who has undergone hip replacement surgery, needed to use "common sense" in performing activities within his capabilities and that Griffin's sitting for long periods of time could result in pain and stiffness in his hip.

Griffin also continued to treat with Dr. Randall Ayers, a rheu - matoid arthritis physician. Griffin testified that he had discussions with Dr. Ayers after Griffin's attempt to return to work in January 2003 and that Griffin understood those conversations to indicate that he was not released to return to work as a truckdriver. Dr. Ayers opined that Griffin's hip injury "combined with,

aggravated, and exacerbated his pre-existing arthritis" and that "Griffin was totally disabled and unable to return to work following the work-related accident . . . due to a combination of his hip injury and active rheumatoid arthritis."

On July 17, 2003, Griffin was admitted to a hospital after suffering a stroke. After the stroke, Griffin experienced weakness, numbness, loss of sensation, loss of short-term memory, and vision problems. In October, Griffin suffered facial burns while removing a "pot pie" from his oven. On October 27, Griffin was diagnosed with a second-degree burn and secondary infection. On June 29, 2004, Griffin was again admitted to a hospital, this time with a seizure disorder. Griffin suffered a fractured humerus, which was surgically repaired. Medical records suggest that the seizure disorder was causally related to Griffin's July 2003 stroke.

On November 10, 2004, Griffin filed an amended petition seeking workers' compensation benefits. Griffin alleged that he had suffered a work-related accident on December 31, 2001, and that his average weekly wage at the time was $1,056. Griffin alleged that he had suffered various injuries as a result of the accident, that those injuries aggravated his arthritis, that the pain medication he had taken for the injuries caused his stroke, and that his subsequent medical problems were causally related to the stroke. Griffin alleged that he was permanently totally disabled or, in the alternative, that he should be found to be "an 'odd-lot' employee." Griffin alleged that he was also entitled to an award of penalties.

On November 17, 2004, DMI filed an answer. DMI alleged that it had paid all benefits due to Griffin; that Griffin's medical problems were caused by his rheumatoid arthritis, not by the work-related accident; and that there was no causal connection between Griffin's stroke and the work-related accident.

On February 4, 2005, the trial court entered an award of benefits. The court found that Griffin had suffered a work-related accident and compensable injuries. The court found that Griffin had proven causation of his hip injury and that the injury was an injury to Griffin's body as a whole. The court found that Griffin had failed to adduce sufficient evidence to prove a causal connection between the work-related accident and subsequent arthritis

problems or the subsequent stroke. The court found that Griffin had reached maximum medical improvement on December 31, 2002, and awarded temporary total disability benefits for the period of time between December 31, 2001, and December 31, 2002. The court also found that Griffin was permanently partially disabled and awarded benefits for a 25-percent loss of earning capacity. The trial court also awarded Griffin future medical expenses and a vocational rehabilitation evaluation. Finally, the court found that there was no reasonable controversy and that Griffin was entitled to a 50-percent waiting-time penalty.

In the trial court's award, the court engaged in a lengthy discussion and analysis of Griffin's average weekly wage. The court found that the purpose of an average weekly wage computation is to approximate an injured employee's wages at the time of the accident. The court found that it would not make sense to include in the average weekly wage calculation the period of time during which Griffin was a probationary "co-driver" and was paid a fixed weekly salary. As such, the trial court based Griffin's benefit award on an average weekly wage calculation that included only the period of time during which Griffin was a "company driver" and was paid based on his mileage.

DMI appealed to the review panel, and Griffin cross-appealed. On August 3, 2005, the review panel entered an order of reversal. The review panel held that the trial court, in determining Griffin's average weekly wage, erred in limiting Griffin's earnings to the period of time he was a "company driver." The review panel remanded the matter with instructions to the trial court to determine how much, if any, of Griffin's earnings as a probationary "co-driver" being paid a fixed weekly salary should be used in the calculation of his average weekly wage. The review panel also reversed the trial court's holdings regarding loss of earning capacity and waiting-time penalties. The review panel affirmed the remainder of the trial court's award. This timely appeal followed.

### III. ASSIGNMENTS OF ERROR

Griffin has assigned eight errors on appeal, which we consolidate for discussion to four. First, Griffin asserts that the review panel erred in reversing the trial court's holding on Griffin's average weekly wage. Second, Griffin asserts that the review panel

erred in reversing the trial court's holding that Griffin is entitled to a waiting-time penalty. Third, Griffin asserts that the review panel erred in affirming the trial court's holding that Griffin failed to prove the causal connection between the work-related accident and the subsequent stroke. Fourth, Griffin asserts that the review panel erred in affirming the trial court's holding that Griffin failed to prove that he is permanently totally disabled.

## IV. ANALYSIS

### 1. STANDARD OF REVIEW

An appellate court may modify, reverse, or set aside a Workers' Compensation Court decision only when (1) the compensation court acted without or in excess of its powers; (2) the judgment, order, or award was procured by fraud; (3) there is not sufficient competent evidence in the record to warrant the making of the order, judgment, or award; or (4) the findings of fact by the compensation court do not support the order or award. *Morris v. Nebraska Health System*, 266 Neb. 285, 664 N.W.2d 436 (2003); *Zavala v. ConAgra Beef Co.*, 265 Neb. 188, 655 N.W.2d 692 (2003); *Vega v. Iowa Beef Processors*, 264 Neb. 282, 646 N.W.2d 643 (2002); *Meredith v. Schwarck Quarries*, 13 Neb. App. 765, 701 N.W.2d 387 (2005). In determining whether to affirm, modify, reverse, or set aside a judgment of the Workers' Compensation Court review panel, a higher appellate court reviews the findings of the single judge who conducted the original hearing. *Morris v. Nebraska Health System, supra*; *Frauendorfer v. Lindsay Mfg. Co.*, 263 Neb. 237, 639 N.W.2d 125 (2002); *Vonderschmidt v. Sur-Gro*, 262 Neb. 551, 635 N.W.2d 405 (2001); *Meredith v. Schwarck Quarries, supra*. Upon appellate review, the findings of fact made by the trial judge of the compensation court have the effect of a jury verdict and will not be disturbed unless clearly wrong. *Morris v. Nebraska Health System, supra*; *Frauendorfer v. Lindsay Mfg. Co., supra*; *Meredith v. Schwarck Quarries, supra*.

### 2. AVERAGE WEEKLY WAGE

Griffin first challenges the review panel's reversing of the trial court's holding concerning Griffin's average weekly wage for purposes of awarding benefits for permanent partial disability.

Griffin asserts that his average weekly wage should be calculated by taking into account only the wages he earned as a "company driver" when he was paid based upon mileage and that his average weekly wage calculation should not take into account the wages he earned as a "co-driver" when he was paid a fixed weekly salary. We agree with Griffin.

The starting point for calculating Griffin's average weekly wage is Neb. Rev. Stat. § 48-126 (Reissue 2004), which provides in relevant part:

> Wherever in the Nebraska Workers' Compensation Act the term wages is used, it shall be construed to mean the money rate at which the service rendered is recompensed under the contract of hiring in force at the time of the accident. . . . In continuous employments, if immediately prior to the accident the rate of wages was fixed by the day or hour or by the output of the employee, his or her weekly wages shall be taken to be his or her average weekly income for the period of time ordinarily constituting his or her week's work, and using as the basis of calculation his or her earnings during as much of the preceding six months as he or she worked for the same employer . . . .

Further, the determination of how the average weekly wage of a workers' compensation claimant should be calculated is a question of law. *Ramsey v. State*, 259 Neb. 176, 609 N.W.2d 18 (2000).

There is no dispute in this case that Griffin was continuously employed by DMI or that immediately prior to the accident, Griffin's rate of wages was fixed by Griffin's output. The dispute in this case centers upon Griffin's contention that the basis of calculation should include only the period of time during the preceding 6 months during which Griffin was recompensed as a "company driver" based upon output and should not include the period of time during which Griffin was paid a fixed weekly salary as a probationary "co-driver." The trial court agreed with Griffin, but the review panel disagreed and thus reversed the trial court's holding.

Our research of case law in Nebraska concerning average weekly wages indicates that there are no recent decisions ad - dressing the specific issue presented: whether, for the purpose of

calculating the employee's average weekly wage, periods of time during the 6 months preceding an accident during which an employee was paid a weekly salary should be included along with periods of time during which the employee was paid a rate of wages fixed by the day or hour or by the output of the employee. However, we find several prior cases involving the calculation of average weekly wages to be instructive.

In *Ramsey v. State, supra*, the 6-month period of time preceding the employee's injury included periods of time during which the employee was compensated at the rate of $5.337 per hour and later periods of time during which the employee was compensated at the rate of $6.772 per hour. The Nebraska Supreme Court concluded that the employee's actual earnings during the 6-month period should be used to calculate her average weekly wage and that the calculation should not be limited only to the hourly rate in effect at the time of the accident. The Supreme Court held that "§ 48-126 does not permit the backward extrapolation of a wage increase so as to distort the average weekly wage actually earned by the worker prior to a compensable injury." *Ramsey v. State*, 259 Neb. at 183, 609 N.W.2d at 23.

In *Harmon v. Irby Constr. Co.*, 258 Neb. 420, 604 N.W.2d 813 (1999), the parties stipulated that the employee's weekly earnings were $487.21 per week. The dispute centered around the fact that the employee received a $30 per diem payment on 6 days during the 6 months preceding the accident. The trial court included the $30 per diem payment for the entire 6-month period rather than for only the 6 days on which the employee actually received the payment. The Supreme Court held that including the $30 per diem payment for days on which the employee did not receive it "distorted the calculation of [the employee's] average weekly wage." *Id.* at 429, 604 N.W.2d at 820.

In the present case, the review panel relied on the decision of the Nebraska Supreme Court in *Mutchie v. M. L. Rawlings Ice Co.*, 122 Neb. 297, 240 N.W. 267 (1932), in concluding that the trial court was incorrect to include in the average weekly wage calculation only those earnings Griffin was paid based on his mileage. In *Mutchie*, the employee was initially paid a weekly salary and was later paid an hourly wage. The Nebraska Supreme Court, in including all of the earnings in the average weekly wage

calculation, emphasized that the employee was "engaged in the same character of employment" under both pay scales. *Id.* at 301-02, 240 N.W. at 269.

We find the key in both *Ramsey v. State*, 259 Neb. 176, 609 N.W.2d 18 (2000), and *Harmon v. Irby Constr. Co., supra*, to be the emphasis on not distorting *the employee's average weekly wage*. A plain reading of § 48-126 suggests that the average weekly wage pertains only to periods of time during which an employee's rate of wages is fixed by the day or hour or by the output of the employee. It would be incongruous and would distort this "average" to include a period of time during which the employee's rate of wages was a weekly salary and was not fixed by the day or hour or by the output of the employee. Nonetheless, the Supreme Court appears to have done just that in *Mutchie v. M. L. Rawlings Ice Co., supra*. However, in *Mutchie*, the Supreme Court emphasized that although the employee's wage schedule changed, he continued to be employed in *the same character of employment*. We find the Supreme Court's emphasis on the employee's character of employment to be important to the court's resolution.

In the present case, we find that the character of Griffin's employment was not the same under the different wage schedules. When Griffin was paid a weekly salary, he was a "co-driver," was on a probationary status, and was required to drive with another person. When Griffin's wage schedule changed to a per-output rate, he became a "company driver," was no longer on a pro-bationary status, and was allowed to drive alone. When Griffin became a "company driver," his hours on the road increased significantly. Because of this change in the character of Griffin's employment, the Supreme Court's holding in *Mutchie v. M. L. Rawlings Ice Co., supra*, is distinguishable. Applying the teachings of the Supreme Court in *Ramsey v. State, supra*, and *Harmon v. Irby Constr. Co., supra*, we conclude that including Griffin's earnings when he was paid a salary and was engaged in a different character of employment would distort Griffin's average weekly wage calculation.

We conclude that the trial court correctly calculated Griffin's average weekly wage, including from the 6 months preceding the accident only the earnings Griffin was paid based upon his

output. As such, we conclude that the review panel erred in reversing that holding of the trial court. We therefore reverse the review panel's holding on Griffin's average weekly wage calculation, and we remand the case to the review panel with directions to affirm the trial court's average weekly wage calculation. Additionally, we note that the review panel also reversed the trial court's finding and remanded the case to the trial court with directions to recalculate Griffin's loss of earning capacity, because the review panel had reversed the trial court's average weekly wage calculation. In light of our holding about Griffin's average weekly wage, and in light of our conclusion below on Griffin's assertion of error concerning permanent total disability, the review panel's holding concerning Griffin's loss of earning capacity is also reversed, and the review panel is directed to affirm the trial court's loss of earning capacity calculation.

### 3. WAITING-TIME PENALTY

Griffin next asserts that the review panel erred in reversing the trial court's award of penalties and attorney fees. The trial court found that there was no reasonable controversy concerning Griffin's average weekly wage and, accordingly, awarded penalties and attorney fees. The review panel, inasmuch as it reversed the trial court's average weekly wage calculation, disagreed and reversed the award of penalties and attorney fees. We conclude that there was a reasonable controversy concerning Griffin's average weekly wage, and we affirm the review panel's reversal of the trial court's award of penalties and attorney fees.

Neb. Rev. Stat. § 48-125 (Reissue 2004) authorizes a 50-percent penalty payment for waiting time involving delinquent payment of compensation and an attorney fee, where there is no reasonable controversy concerning an employee's claim for workers' compensation. *Milliken v. Premier Indus.*, 13 Neb. App. 330, 691 N.W.2d 855 (2005). A reasonable controversy under § 48-125 may exist (1) if there is a question of law previously unanswered by the appellate courts, which question must be answered to determine a right or liability for disposition of a claim under the Nebraska Workers' Compensation Act, or (2) if the properly adduced evidence would support reasonable but opposite conclusions by the Nebraska Workers' Compensation

Court concerning an aspect of an employee's claim for workers' compensation, which conclusions affect allowance or rejection of an employee's claim, in whole or in part. *Milliken v. Premier Indus., supra.* To avoid the penalty provided for in § 48-125, an employer need not prevail in the employee's claim, but must have an actual basis in law or fact for disputing the claim and refusing compensation. *Id.*

In the instant case, our discussion above concerning the proper calculation of Griffin's average weekly wage demonstrates that there was a reasonable controversy. The instant case is arguably a case of first impression, being distinguishable from the only prior case involving the inclusion of both a salaried compensation and a rate of compensation fixed by output. As such, we conclude that the review panel correctly found that the trial court erred in awarding waiting-time penalties and attorney fees.

### 4. CAUSATION OF STROKE

Griffin next asserts that the review panel erred in affirming the trial court's holding that Griffin had failed to prove a causal connection between the accident and Griffin's subsequent stroke and related complications. Griffin argues that he demonstrated a direct and natural causal connection. We conclude that the trial court's finding on this matter was not clearly wrong.

The determination of causation is, ordinarily, a matter for the trier of fact. *Vega v. Iowa Beef Processors*, 270 Neb. 255, 699 N.W.2d 407 (2005). In testing the sufficiency of the evidence to support the findings of fact made by the compensation court, the evidence must be considered in the light most favorable to the successful party. *Id.* As the trier of fact, the compensation court is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *Id.*

In the instant case, the trial court found that Griffin's evidence concerning causation of his stroke "was not altogether persuasive as to the amounts of Vioxx taken by [Griffin] or the periods of time during which it was ingested." The trial court further expressly found that Griffin was not obligated to overcome "some high hurdle of proof" but that Griffin had "left [the court] scratching its proverbial head over some obviously unanswered questions, i.e. degree of required dosage, extent of usage, and passage

of time between termination of use and onset of stroke." The court concluded with the following question: "Is any stroke suffered by one who ingested Vioxx at some point in the past to be deemed a result thereof?"

In light of the foregoing, we determine that with regard to Griffin's stroke, there is sufficient evidence in the record to warrant the decision of the trial court that Griffin failed, regarding questions of fact, to prove causation. Accordingly, we find that the review panel did not err in affirming the trial court's finding on this issue.

### 5. PERMANENT TOTAL DISABILITY

Finally, Griffin asserts that the review panel erred in affirming the trial court's holding that Griffin did not prove that he was permanently totally disabled as a result of the accident. Griffin asserts that the trial court erred in relying on evidence from DMI's expert witness, Dr. D.M. Gammel, and in not finding that Griffin's hip injury combined with his preexisting arthritis to render him permanently totally disabled. We find sufficient evidence to support the trial court's findings.

Whether a plaintiff in a Nebraska workers' compensation case is totally and permanently disabled is a question of fact. *Frauendorfer v. Lindsay Mfg. Co.*, 263 Neb. 237, 639 N.W.2d 125 (2002). Total and permanent disability contemplates the inability of the worker to perform any work which he or she has the experience or capacity to perform. It does not mean a state of absolute helplessness but means disablement of an employee to earn wages in the same kind of work, or work of a similar nature, that he or she was trained for or accustomed to perform, or any other kind of work which a person of his or her mentality and attainments could do. *Id.*

Griffin first asserts that the trial court erred in relying on the opinion of DMI's expert witness, Dr. Gammel. A review of the trial court's award, however, reveals that the trial court concluded Griffin failed to prove the accident aggravated his arthritis but that the trial court did not solely rely on Dr. Gammel's opinions. Rather, the trial court specifically found that Dr. Gammel's opinions and testimony concerning the subject of rheumatoid arthritis in general were enlightening. The trial court specifically found that Griffin's expert witness, Dr. Ayers, did not provide

sufficient "analysis or discussion" to support his conclusion on aggravation. The trial court's holding was that as a question of fact, "the [c]ourt simply remain[ed] unconvinced that a sufficient causal link [had] been shown between the hip injury found to be compensable and [Griffin's] claim of an aggravation of his rheumatoid arthritis." We do not find the trial court to be clearly wrong in this regard.

With respect to the ultimate question of whether Griffin proved permanent total disability, the trial court specifically indicated that it had "carefully reviewed the medical evidence submitted as well as the lay testimony offered" and concluded that Griffin had proven that he is permanently partially disabled. The trial court specifically relied upon the functional capacity evaluation that indicated Griffin met the general physical demands set forth for a truckdriver, Griffin's work history, and the medical and lay testimony. We will not reweigh the evidence in this case, and we do not find the trial court's factual conclusion that Griffin is not permanently totally disabled to be clearly wrong. Accordingly, we affirm the review panel's affirmance of the trial court's holding on this issue.

## V. CONCLUSION

We reverse the review panel's holding that the trial court erred in calculating Griffin's average weekly wage. We remand the case to the review panel with directions to affirm the trial court's holding concerning Griffin's average weekly wage. We also reverse the review panel's holding that the trial court needed to recalculate Griffin's loss of earning capacity, and we direct the review panel to also affirm that holding of the trial court. We affirm the review panel's order in all other respects.

AFFIRMED IN PART, AND IN PART REVERSED
AND REMANDED WITH DIRECTIONS.

CASSEL, Judge, dissenting in part.

I respectfully dissent from that portion of the majority opinion reversing the review panel's determination concerning Griffin's average weekly wage. Neb. Rev. Stat. § 48-126 (Reissue 2004) defines "wages" in two respects relevant to the case before us.

The first definition in § 48-126—"the money rate at which the service rendered is recompensed under the contract of hiring in

force at the time of the accident"—simply takes a weekly salary, or a monthly or annual salary converted to its weekly equivalent, and utilizes that amount. Thus, if Griffin's weekly salary at the time of the accident had been $1,258 (the amount he testified that he earned the first week under the different wage arrangement), § 48-126 would have recognized that amount as his "wages."

However, § 48-126 recognizes a different method of calculation where (1) the employment is "continuous" and (2) "immediately prior to the accident the rate of wages was fixed by the day or hour or by the output of the employee." The majority concedes that both of these conditions are satisfied, but nevertheless declines to apply the method of calculation dictated by the statute in that event.

Based upon the majority's "plain reading" of § 48-126, it characterizes as "incongruous" the inclusion of the period in which Griffin's rate of wages was a weekly salary. Nevertheless, the majority acknowledges that the Nebraska Supreme Court did "just that" in *Mutchie v. M. L. Rawlings Ice Co.*, 122 Neb. 297, 240 N.W. 267 (1932).

The majority justifies its decision by attempting to distinguish the instant case from *Mutchie*, asserting that the character of Griffin's employment was not the same under the different wage schedules. While I agree that the "character of employment" was important in the Supreme Court's analysis in *Mutchie*, I contend that the majority misinterprets that phrase in the context of § 48-126.

In *Mutchie*, the "character of employment" was the employee's "making deliveries [of ice] and doing common labor." 122 Neb. at 298, 240 N.W. at 267. Prior to August 23, 1930, the employee was paid a weekly salary and evidently worked solely for the employer. However, after August 23, the employee was paid 30 cents an hour for delivering ice for the employer "afternoons, evenings and Sundays" and also worked "forenoons" as an independent contractor using his brother's truck. *Id.* at 302, 240 N.W. at 269. While the present memory of the "ice business" described in *Mutchie*, 122 Neb. at 298, 240 N.W. at 267, applies only to persons of middle age or older, and while the working times and wage rates in *Mutchie* differ considerably from modern norms, it is clear from the Supreme Court's opinion that the employee's

work schedule after August 23 was considerably different from the schedule in effect prior to that date. The Supreme Court necessarily looked to the nature of the work, rather than the change of schedule, in determining that the employee was engaged in the "same character of employment." *Id.* at 301-02, 240 N.W. at 269.

In the instant case, the majority treats the increase in Griffin's working hours as a change in the character of his employment. I disagree. Just as the Nebraska Supreme Court in *Mutchie* considered the employee's functions—delivering ice and providing common labor—as the same character of employment before and after the change in schedule, I view Griffin's employment as a truckdriver during his period of service as a "co-driver" as constituting the same character of employment as his performance as a truckdriver when he was labeled a "company driver." The evidence does not support a change in the nature of Griffin's function, but only a change in the number of hours he worked. The decision in *Mutchie* shows that the statute requires that Griffin's amount of wages be determined by the alternative method applicable to continuous employment where the rate of wages is fixed by the output of the employee.

Although the majority does not characterize it as such, it appears that the majority views Griffin's work as a "co-driver" to be an entirely separate employment than his service as a "company driver." The majority's implicit approach conflicts with settled law defining "continuous employments" under § 48-126. In *Newberry v. Youngs*, 163 Neb. 397, 401-02, 80 N.W.2d 165, 168 (1956), the Nebraska Supreme Court held:

> [T]he term continuous employments in section 48-126 . . . relates to the contract of hiring and is applicable to those situations where the relationship of employer and employee is a continuing one. It does not depend in its application on the number of hours an employee works in a day or the number of days an employee works in a week. Those questions go to the matter of the performance of the contract and not to the nature of the contract.

In the case before us, Griffin was employed by DMI as a truckdriver. During the time that Griffin was designated a "co-driver," DMI and Griffin enjoyed the relationship of employer and employee. That relationship did not change when DMI

changed Griffin's title to "company driver." The "nature of the contract" did not change when Griffin's title changed. Within the meaning of § 48-126, Griffin's time of service as a "co-driver" and his period of employment as a "company driver" constituted a single period of continuous employment.

Where the employment was continuous and the rate of wages immediately prior to the accident was fixed by Griffin's output, § 48-126 requires us to determine his weekly wages by using his "average weekly income for the period of time ordinarily constituting his . . . week's work, and using as the basis of calculation his . . . earnings during as much of the preceding six months as he . . . worked for the same employer."

I attribute importance to the use of the word "income" in the phrase "average weekly income." That word connotes a broader scope than "wages" or "salary" and is sufficiently comprehensive to include both "wages" and "salary."

My analysis is not driven by the result, nor do I believe that the majority's interpretation is result oriented. Naturally, the parties having a financial interest in the outcome of the case may be influenced by the resulting effect of the alternative approaches. In *Mutchie v. M. L. Rawlings Ice Co.*, 122 Neb. 297, 240 N.W. 267 (1932), the court's calculation worked to the benefit of the employee, because his wages were higher during the earlier period than at the time of his accident. In the case before us, the same method of calculation works to the benefit of the employer, because Griffin's earnings were lower during the earlier period.

This potential result has been apparent for over 70 years, ever since the decision of the Nebraska Supreme Court in *Mutchie*. When judicial interpretation of a statute has not evoked a legislative amendment, it is presumed that the Legislature has acquiesced in the court's interpretation. *Sheldon-Zimbelman v. Bryan Memorial Hosp.*, 258 Neb. 568, 604 N.W.2d 396 (2000). I recognize that the entire objective of wage calculation is to arrive at a fair approximation of the claimant's probable future earning capacity. See 5 Arthur Larson & Lex K. Larson, Larson's Workers' Compensation Law § 93.01[1][e] (2005). If I felt free to do so, I would depart from the interpretation in *Mutchie*.

However, it is the function of the Legislature through the en - actment of statutes to declare what is the law and public policy

of this state. *In re Claims Against Atlanta Elev., Inc.*, 268 Neb. 598, 685 N.W.2d 477 (2004). Indeed, the Legislature has already provided in § 48-126 for an adjustment of the employee's wages if "such method of computation does not fairly represent the earnings of the employee," but limited that adjustment to employees engaged in seasonal employment or employment dependent upon the weather. The Legislature has not chosen to provide an exception to authorize the result sought by Griffin in the instant case. I do not believe that this court can properly depart from the settled meaning of the statute. In my opinion, because the character of Griffin's employment did not change during the period of his continuous employment, § 48-126 requires the result reached by the review panel on this issue.

I agree with the majority opinion concerning its resolution of the other issues presented by this appeal.